**David C. GRAHAM, Plaintiff,**

v.

**CSC CREDIT SERVICES, INC., Gateway, Inc., and Citibank d/b/a/ Hurley State Bank, Defendants.**

**No. 02–CV–3707(MJD/JGL).**

United States District Court,
D. Minnesota.

March 8, 2004.

Thomas J. Lyons, Jr., Thomas J. Lyons, Lyons & Associates, St. Paul, MN, John H. Goolsby, Consumer Justice Center, St. Paul, MN, for Plaintiff.

Charles Frederick Webber, Lianne Knych, Erik J. Girvan, Faegre & Benson, Minneapolis, MN, for Defendant CSC Credit Services, Inc.

## MEMORANDUM AND ORDER

DAVIS, District Judge.

### I. INTRODUCTION

This matter is before the Court on the motion of Defendant CSC Credit Services, Inc. ("CSC"), for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court heard oral argument on January 30, 2004. For the following reasons, the Court denies Defendant's motion.

### II. BACKGROUND

On April 26, 2002, Plaintiff David Graham and his wife sought to refinance their mortgage with Alpine Mortgage. At that time, their mortgage had an interest rate of 8 1/8%. Due to Alpine's high closing costs, the Grahams eventually decided not to refinance with Alpine.

During the application process, Alpine obtained a copy of Graham's credit report from CSC and provided a copy to Graham. The report listed a Gateway/CB–USA account in Graham's name with a delinquent status of R5 and stated that no payment had been received on the Gateway account. In fact, Graham was a victim of identity theft and the Gateway account had been fraudulently opened in his name.

Graham's April 2002 credit report listed four past instances of late payment history, category 2, which Graham admits were reported accurately. The relevant payment history categories are interpreted as follows: category 1: "paid as agreed;" category 2: "30+ days past due;" category 3: "60+ days past due;" category 4: "90+ days past due;" and category 5: "Pays or paid 120+ days past the due date; or collection account." The credit report also listed one account with a current payment rating of 5: the Gateway account. The Gateway account was the only account in any status other than 1 or 2 over the twenty-four month period examined by the April 2002 credit report and the only account with a delinquency as of April 2002.

On April 30, 2002, Graham telephoned CSC and informed CSC that the Gateway account did not belong to him and that two addresses listed on his credit report were not correct. CSC provided Gateway's number to Graham, and submitted an Automated Consumer Dispute Verification form ("ACDV") to Gateway asking Gateway to verify the Gateway account. CSC did not communicate to Gateway that Graham's dispute also encompassed the two addresses.

CSC alleges that Gateway responded electronically to CSC and verified the account information. Gateway's response was processed electronically, and not analyzed by a person. CSC is unable to produce a copy of the April and May communications between CSC and Gateway. CSC has testified that the ACDV stated "not his/hers, please provide complete ID, attention Mrs. Lippert." (Mrs. Lippert was employed at Gateway.) A Gateway representative, however, provided an affidavit stating that Gateway suspected that the account was fraudulent, had made such a notation in Graham's account, and would have provided that information upon request to any entity with proper authorization.

CSC also sent ACDVs to other creditors regarding the two addresses that Graham disputed, which the creditors did not verify. CSC deleted the two addresses from Graham's report. CSC did not investigate how the two addresses entered Graham's

credit file. CSC's system cannot cross-reference two disputed items contained in one dispute.

During the first week of May 2002, Graham and his wife met with Mike Anderson, a loan officer at First Republic Mortgage, regarding refinancing their mortgage. Graham showed Anderson a copy of the credit report that he had obtained from Alpine Mortgage, which contained the derogatory Gateway tradeline. Graham claims that he understood that First Republic would refinance their mortgage at 6.25% if the delinquent Gateway account was erroneous.

On May 28, 2002, CSC sent a letter to Graham stating that its investigation was complete, that Gateway had verified that CSC was accurately reporting the Gateway tradeline, and that the two disputed addresses had been removed from his report. CSC did not alter the Gateway tradeline. In June 2002, First Republic refinanced the Graham's mortgage for a 15–year term at 6.75% (or at 7.059%, depending on the method of calculation).

On July 23, 2002, Graham's attorney sent a letter to CSC stating that Graham disputed having had any business with Gateway. On August 1, 2002, CSC sent another ACDV to Gateway that stated that the nature of the dispute was "Inaccurate information. Need complete ID/account information." Gateway responded on August 7, 2002, stating that a change should be made to more precisely reflect the amount of delinquency on the account. It also stated that the ID information Gateway possessed showed a different address—the address that CSC had previously deleted in response to Graham's dispute.

CSC removed the Gateway account from Graham's credit report on September 9, 2002. Throughout the time of Graham's dispute with CSC, he was engaged in a series of frustrating telephone conversa-tions with Gateway and Citibank attempting to correct the fraudulent account.

On September 25, 2002, Graham sued CSC, Gateway, Inc., and Citibank, doing business as Hurley State Bank. He filed an amended complaint on December 19, 2002. Graham has settled with defendants Gateway, Inc., and Citibank. Thus, CSC is the only remaining defendant. Graham sued CSC for violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681e(b), 1681i, and for credit defamation. CSC has filed a motion for summary judgment on Graham's claims.

## III. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citation omitted).

### B. Whether CSC Violated Section 1681e(b)

Section 1681e(b) of the FCRA states: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Credit reporting agencies are not strictly liable for inaccuracies con-

tained in credit reports. *Hauser v. Equifax, Inc.,* 602 F.2d 811, 814 (8th Cir.1979). Instead, a plaintiff must show "that the inaccuracy resulted from the agency's failure to follow reasonable procedures to assure maximum possible accuracy." *Id.* at 814–15 (internal quotations omitted). "In the majority of cases, reasonableness is a question for the jury." *Cousin v. Trans Union Corp.,* 246 F.3d 359, 368 (5th Cir. 2001) (citations omitted).

CSC asserts that as a matter of law, a credit reporting agency satisfies the reasonableness standard when it relies on information furnished to it and has no reason to doubt the accuracy of that information. *See, e.g.,* Fed. Trade Comm'n Commentary on the Fair Credit Reporting Act, 16 C.F.R. Part 600, App.; *Olwell v. Med. Info. Bureau,* No. Civ. 01–1481, 2003 WL 79035, at *4 (D.Minn. Jan.7, 2003). CSC argues that, before receiving Graham's dispute in April 2002, it had no knowledge that Gateway may have been reporting the account inaccurately. CSC also asserts that it followed reasonable procedures in maintaining Graham's credit report before the Gateway dispute.

Under section 1681e(b), a consumer reporting agency must follow reasonable procedures "whenever" it prepares a consumer report. 15 U.S.C. § 1681e(b), even *after* it receives notice of a dispute. Thus, while CSC may have been entitled to rely on the information that it received from Gateway before it received the dispute from Graham, CSC did have reason to doubt the information from Gateway after it had received Graham's disputes, deleted two disputed address, and received a response from Gateway reporting one of the deleted addresses. *See Evantash v. G.E. Capital Mortgage Services, Inc.,* No. Civ. A. 02–CV–1188, 2003 WL 22844198, at *4 (E.D.Pa. Nov.25, 2003) (denying summary judgment on section 1681e(b) claim where, "[d]espite the inconsistencies in [the user's] reporting, [the agency] failed to further inquire about the status of the Account").

Additionally, Graham raises an issue of material fact when he argues that CSC's procedures were unreasonable even before it received notice of Graham's dispute, because CSC failed to keep track of the source of the addresses that it reported on Graham's report. Consequently, when Graham contacted CSC to dispute the addresses, CSC had no way to know that the disputed address came from the same source as the disputed tradeline, a fact which would have alerted CSC to the identity theft. "The determination of the 'reasonableness' of the defendant's procedures ... is treated as a factual question even when the underlying facts are undisputed. It therefore cannot be resolved on summary judgment unless the reasonable or unreasonableness of the procedures is beyond question ..." *Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 664 (7th Cir. 2001). The reasonableness of CSC's procedures for tracking the sources of the information that it receives is not "beyond question." Thus, the Court concludes that a question of material fact remains regarding whether CSC violated section 1681e(b).

### C. Whether Graham Suffered Damages

█ CSC moves for summary judgment on Graham's claims under the FCRA on the grounds that Graham cannot prove that CSC proximately caused him damages. (For the purposes of its motion for summary judgment, CSC assumes that it violated section 1681i.) Under the FCRA, credit reporting agencies are liable to consumers for "actual damages" caused by violation of the FCRA. 15 U.S.C. § 1681o. Graham "bears the burden of proving actual damages sustained as a result of [CSC's] activities." *Casella v. Equifax*

*Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir.1995). In the absence of actual damages, a consumer can still recover punitive and statutory damages under section 1681n, if he can show that the defendant "willfully fail[ed] to comply" with the FCRA.

### 1. Whether Graham Suffered Any Out-of-Pocket Damages

■ CSC argues that Graham cannot show that he suffered any out-of-pocket damages because during the time that the Gateway tradeline was on his CSC report, Graham refinanced his mortgage at a rate lower than the 8 1/8% rate he had before. CSC asserts that Graham has no admissible evidence regarding whether the Gateway tradeline caused First Republic to charge Graham a higher rate than it otherwise would have.

To support his assertion that First Republic raised Graham's rate due to the Gateway tradeline, Graham relies on his deposition testimony regarding statements by First Republic loan officer, Mike Anderson. CSC claims that Graham's recitation of Anderson's statement is inadmissible hearsay under Federal Rule of Evidence 801, and that a party may not rely on hearsay evidence to defeat a motion for summary judgment. *See Walker v. Wayne County, Iowa*, 850 F.2d 433, 435 (8th Cir.1988). The Court does not need to address the issue at this time, because Graham's claims survive summary judgment even without consideration of Anderson's statements. If Graham seeks to use those statements at trial, the Court assumes that one of the parties will bring a motion *in limine* regarding whether or not the statements are admissible.

■ The Court notes that a consumer only needs to show that the erroneous negative information was a substantial factor in a creditor's adverse credit decision. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 968–69 (3d Cir.1996). The consumer does not need to eliminate the possibility that accurate negative information also contributed the creditor's adverse decision. *Id.* at 969. Graham contends that he can show that the false Gateway tradeline was at least a substantial factor in First Republic's decision to take an adverse credit action against him, because any other negative information on the CSC report was not nearly as derogatory as the false Gateway tradeline. Additionally, Graham's credit report states that his credit score is low due to, among other things, "serious delinquency" and "amount owed on delinquent accounts." The Gateway tradeline was a category 5 as of the time of the report, the most serious delinquency rating. The only other delinquencies were past delinquencies of category 2—the least delinquent delinquency rating. A reasonable trier of fact could infer that the term "serious delinquency" refers to the Gateway tradeline.

By a process of elimination argument, Graham has raised an issue of material fact regarding whether the Gateway tradeline in the CSC report was a substantial factor in First Republic's decision to charge Graham the interest rate that it did. The Court finds that Graham has raised a genuine issue of material fact regarding whether CSC caused him to suffer out-of-pocket damages.

### 2. Mitigation of Damages

■ CSC argues that as a matter of law, Graham has failed to mitigate his damages. CSC asserts that after it removed the Gateway tradeline from Graham's credit report, interest rates fell below the rate at which Graham refinanced his mortgage in June 2002. CSC further asserts that if Graham had refinanced again, he could have eliminated any dam-

ages that he incurred as a result of the June 2002 refinancing.

The Court has been unable to locate any FCRA cases addressing a consumer's duty to mitigate damages. Assuming such a duty does exist, CSC fails to demonstrate that, by refinancing, Graham would have eliminated his damages. CSC fails to establish that Graham could have refinanced at a particular interest rate, particularly when weeks after closing on the First Republic loan, Graham's wife left her paying job to stay home with their child. Even if Graham had refinanced the remaining principal on his mortgage loan at a lower interest rate, he had already made payments at the higher interest rate until September 2002, when the Gateway tradeline was removed. Additionally, Graham would have incurred additional closing costs and spent additional time if he had attempted to refinance again. CSC has failed to show that as a matter of law, Graham failed to mitigate his damages.

### 3. Whether Graham Suffered Emotional Distress Damages

■ CSC argues that as a matter of law, Graham cannot show that CSC's conduct caused Graham emotional distress. CSC asserts that Graham testified that his emotional distress was caused by Gateway and Citibank, not by CSC. The Court notes, however, that because CSC delayed in correcting Graham's credit report, Graham was forced to continue prolonged and frustrating negotiations with Gateway, Citibank, and CSC in an attempt to eliminate a derogatory and fraudulent account from his credit report. Additionally, Graham suffered the humiliation of having creditors view his incorrect credit report.

CSC also argues that Graham's evidence of distress is insufficient as a matter of law, because Graham felt no physical symptoms and sought no medical help. CSC attempts to create a standard for

recovery of emotional distress damages that is higher than that required by the FCRA. The Eighth Circuit has upheld an award of actual and punitive damages when plaintiffs were unable to demonstrate out-of-pocket costs but "testified about how they felt when appellant obtained their credit reports and violated their privacy, thereby causing them some emotional distress." *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir.1998). *See also Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834–35 (8th Cir.1976) (noting that emotional distress damages for "mere mental pain and anxiety" are available under the FCRA). Graham's testimony regarding his frustration, anxiety, and humiliation throughout his ordeal raised a genuine issue of material fact regarding whether he suffered emotional distress damages.

### 4. Whether Graham Is Entitled to Punitive Damages

■ CSC argues that Graham is not entitled to recover punitive or statutory damages, because he cannot show that CSC "willfully failed to comply with a FCRA requirement." 15 U.S.C. § 1681n. To recover punitive or statutory damages under the FCRA, Graham must demonstrate "knowing and intentional commission of an act the defendant knows to violate the law." *Phillips v. Grendahl*, 312 F.3d 357, 370 (8th Cir.2002). The fact that CSC "had some experience in dealing with credit reports and ... knew of the Fair Credit Reporting Act ... support[s] an inference that [CSC] knew that [its] actions were impermissible." *Phillips*, 312 F.3d at 371.

Graham alleges that CSC willfully violated the FCRA in a number of ways. He asserts that CSC's ACDVs to Gateway failed to adequately communicate that Graham disputed ownership of the Gateway

account. A Gateway representative has submitted an affidavit stating that if CSC had specifically asked Gateway whether the account was fraudulent, Gateway would have identified Graham's account as being the victim of identity theft. Graham also argues that CSC willfully violated the FCRA when it did not respond to Graham's July 23, 2002, dispute within the statutorily prescribed time.

Most notably, CSC made the intentional policy decision to not record the source of the address information it included in its credit reports. This decision, made in the face of a growing problem of identity theft,[1] severely exacerbated the initial problem in this case. The decision to design such a system may constitute an intentional act that CSC knew was in violation of the FCRA's requirement that it "follow reasonable procedures to assure maximum possible accuracy of the information concerning [Graham]." 15 U.S.C. § 1681e(b). The Court finds that Graham has raised a question of material fact regarding whether he is entitled to punitive damages.

### D. Whether CSC Has Qualified Immunity from Graham's State Defamation Claim

 CSC asserts that Graham's claim against it for credit defamation is preempted by the FCRA. The FCRA provides qualified immunity for credit reporting agencies, such as CSC, from defama-

tion claims based on information disclosed pursuant to the FCRA. *Thornton v. Equifax, Inc.,* 619 F.2d 700, 703 (8th Cir.1980).

The FCRA states:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation ... with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e). Sections 1681g, 1681h, and 1681m of the FCRA provide for mandatory disclosure of information to the consumer about whom the information pertains. Sections 1681g and 1681h require credit reporting agencies to disclose credit information to consumers upon consumers' request. 15 U.S.C. § 1681g, 1681h. Section 1681m requires users of consumer reports to disclose information to consumers against whom they have taken adverse actions. 15 U.S.C. § 1681m.

---

1. The fear of identity theft is not false hysteria, but rather is a way of life in the digital age. In 2003, the Federal Trade Commission reported that over twenty-seven million Americans were victims of identity theft in the past five years, including almost ten million people in the past year. Federal Trade Commission, *FTC Releases Survey of Identity Theft in U.S.: 27.3 Million Victims in Past 5 Years, Billions in Losses for Businesses and Consumers,* http://www.ftc.gov/opa/2003/09/idtheft.htm (Sept. 3, 2003). Businesses involved in the credit reporting industry need to be aware of this growing problem and must take reasonable precautions against reporting fraudulent tradelines. Credit reporting systems that were adequate in the past may be flagrantly inadequate in this new age. Under the FCRA, credit reporting agencies have a duty to update their systems to continue to strive for accuracy when new dangers, such as identity theft, change the definition of what constitutes "reasonable procedures to assure maximum possible accuracy of ... information." 15 U.S.C. § 1681e(b).

▇▇▇▇▇ Qualified immunity from certain tort actions applies only if the action is "based on information disclosed pursuant to requirements of the Act." *Thornton v. Equifax, Inc.*, 619 F.2d 700, 703 (8th Cir. 1980). "[I]f the information is or has been disclosed to the person being investigated pursuant to the Act, consumer actions are not allowed unless within the qualification of section 1681h(e). The Act does not preclude an action at common law except where information that would give rise to a cause of action is obtained by the complainant pursuant to the provisions of the Act." *Id.* (internal quotations omitted).

In *Thornton*, the plaintiff first learned of the derogatory credit information from an insurance agent. *Id.* at 704. After being alerted to the information by the insurance agent, the plaintiff contacted the credit reporting agency to deny the information. *Id.* at 702. The credit reporting agency read the derogatory information to the plaintiff and instituted a reinvestigation. After the reinvestigation, the credit reporting agency decided that the information was accurate. *Id.* It later provided a copy of the credit report containing the derogatory information to the plaintiff and her attorney. *Id.* at 703. The plaintiff sued the credit reporting agency for defamation and violations of the FCRA.

The Eighth Circuit held: "The fact that [the plaintiff] was originally notified of the existence of the information by the insurance company, the procurer of the report, does not make the conditional privilege of the Act inapplicable. Before [the credit reporting agency] has the obligation of disclosure, the consumer must make such a request. In all likelihood, such a request will not be made unless a consumer is aware of the existence of such a report containing unfavorable information." *Id.* at 704 (footnote omitted). "[The credit reporting agency] by its disclosure is entitled to qualified immunity subject to the proof required by the statute." *Id.*

In this case, the parties do not dispute that, in response to Graham's dispute of the Gateway tradeline, CSC investigated the issue and provided Graham with a copy of his credit report containing the derogatory Gateway tradeline. Although Graham first learned of the derogatory tradeline from a third party, as in *Thornton*, CSC did eventually provide Graham a copy of his report containing the allegedly defamatory information, as required under 15 U.S.C. § 1681g. The conditional privilege of section 1681h(e) applies even though the consumer first learns of the derogatory information from a third party, as long as the credit reporting agency later provides the information to the consumer pursuant to the FCRA. Thus, CSC is entitled to qualified immunity under section 1681h(e).

▇▇▇▇ Graham argues that, even if the qualified immunity applies, he is able to overcome that immunity because CSC furnished the information "with malice or willful intent to injure [Graham]." 15 U.S.C. § 1681h(e). The Eighth Circuit has stated that this standard may be equated with the *New York Times Co. v. Sullivan* standard that the statement be made with "knowledge that it was false or with reckless disregard of whether it was false or not." *Thornton v. Equifax, Inc.*, 619 F.2d 700, 703 (8th Cir.1980) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). *Accord Gordon v. Greenpoint Credit*, 266 F.Supp.2d 1007, 1013 (S.D.Iowa 2003); *Yutesler v. Sears Roebuck & Co.*, 263 F.Supp.2d 1209, 1212 (D.Minn.2003); *Olwell v. Med. Info. Bureau*, No. Civ. 01–1481, 2003 WL 79035, at *5 (D.Minn. Jan.7, 2003).

CSC made the decision to employ a system incapable of tracking the source of

consumer's address information and failed to note that Gateway claimed that Graham's address was one that CSC had deleted. CSC made a decision to use a system that did not alert it to the fraudulent nature of the Gateway account, despite the growing issue of identity theft and the numerous red flags raised in CSC's investigation of Graham's report. In the fact of the shortfalls of its system, CSC chose to report the Gateway tradeline. Whether CSC's decision and conduct resulted in its furnishing the erroneous Gateway information with reckless disregard for the truth is a question best left to the jury. The Court concludes that Graham has raised a genuine issue of material fact regarding whether CSC furnished the Gateway information with malice or willful intent to injure Graham. Thus, the Court will not grant summary judgment on Graham's credit defamation claim.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

Motion by CSC Credit Services for Summary Judgment [Docket No. 36] is **DENIED.**