James McKEOWN, Plaintiff,

v.

SEARS ROEBUCK & CO., Trans Union LLC, Factual Data, Inc, Equifax Inc. d/b/a Equifax Information Services, LLC and CSC Credit Services, Inc., Defendants.

No. 03–C–528–C.

United States District Court, W.D. Wisconsin.

July 28, 2004.

Thomas J. Lyons, Jr., St. Paul, MN, for Plaintiff.

Cheryl L. Hanson, Murnane, Conlin, White & Brandt, Saint Paul, MN, Abraham J. Colman, Buchalter, Nemer, Fields & Younger, Los Angeles, CA, Ian A.J. Pitz, Michael Best & Friedrich, LLP, Madison, WI, Christopher Lane, Katz & Korin, P.C., Indianapolis, IN, Scott G. Thomas, Attorney at Law, New Berlin, WI, Lewis P. Perling, Kilpatrick Stockton, LLP, Atlanta, GA, Charles F. Webber, Faegre & Benson LLP, Minneapolis, MN, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary and injunctive relief. Plaintiff James McKeown contends that defendants Trans Union LLC, Factual Data, Inc., Equifax Inc. d/b/a Equifax Information Services, LLC, CSC Credit Services, Inc. and Sears Roebuck & Co. are liable to him for (1) violation of the Fair Credit Reporting Act; (2) credit defamation; and (3) tortious interference with credit expectancy. In addition plaintiff asserts that defendant Sears is liable for invading his privacy. Now before the court are four separate motions for summary judgment filed by defendants Trans Union, Equifax, CSC and Sears. (Defendant Factual Data has not moved for summary judgment.) Jurisdiction is present. 28 U.S.C. §§ 1331 and 1367.

None of the motions will be granted with respect to plaintiff's claims under the Fair Credit Reporting Act although plaintiff will not be allowed to seek: (1) damages for any differences in the terms between the mortgage he was able to secure and the terms he might have received had it not been for an error in his credit history; (2) recovery for any credit denial after July 7, 2003; (3) punitive damages against either defendant CSC or defendant Equifax; or (4) any actual damages against defendant Sears for its handling of the consumer dispute that plaintiff submitted to defendants CSC and Equifax in April 2003. Defendant Trans Union's motion will be granted with respect to plaintiff's state law claims of credit defamation and tortious interference with credit expectancy because these claims are preempted under the Fair Credit Reporting Act. Defendants CSC's and Equifax's motions will be denied with respect to plaintiff's credit defamation and tortious interference claims; neither defendant made a disclosure to plaintiff that would trigger the Fair Credit Act's preemption provision. Finally, defendant Sears's motion will be granted with respect to plaintiff's invasion of privacy and tortious interference with credit expectancy claims. By failing to respond to defendant Sears's motion for

judgment with respect to these claims, plaintiff has forfeited them.

Defendant Equifax has argued that plaintiff sued the wrong party. In its briefs, defendant Equifax asserts that it is merely a holding company and that plaintiff should have brought his claim directly against its subsidiary Equifax Information Services. However, there is no evidence to support this assertion of corporate structure. I will reserve judgment on this issue until there is sufficient evidence on which to reach a conclusion. Although arguing that it is a separate legal entity, defendant Equifax has moved for summary judgment apparently on behalf of Equifax Information Services on the merits of plaintiff's claims. In the event that defendant Equifax is dismissed from this action on the ground that it is found to be a separate legal entity, this summary judgment opinion will have no effect on any claim plaintiff may bring against Equifax Information Services either by obtaining leave from the court to amend his complaint in this case or by filing a separate suit.

From the parties' combined proposed findings of fact, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

Plaintiff James McKeown is an individual residing in Grantsburg, Wisconsin. Defendants CSC Credit Services, Inc., Trans Union LLC and Equifax Information Services (Equifax) are consumer reporting agencies as that term is defined in the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f). Each collects credit information from a variety of creditors and distributes consumer profile reports to potential future creditors. Defendant Sears Roebuck & Co. is an Illinois corporation that extends credit lines to consumers and reports account information to a variety of consumer reporting agencies, including de-

fendants CSC and Trans Union, which maintain consumer profile reports of plaintiff. Defendant Equifax operates nationally. However, in many geographical areas, it contracts with smaller credit reporting agencies for the files they own on residents of those areas. Defendant Equifax does not own a file for plaintiff or any other consumer living in Wisconsin. Instead, it contracts with defendant CSC for its files on Wisconsin consumers.

### A. Sears Account

In April 1998, defendant Sears issued a credit card and assigned an account number 0177540397789 to someone. Defendant Sears's internal records for this account bear the name "JAMES N. MC OWEN." On April 29, 2002, defendant Sears received a written notice that the account holder was deceased. The letter was unsigned and did not give a date or location of death. Defendant Sears's computer system does not indicate that the letter included a social security number. Shortly thereafter, defendant Sears closed the account, entered a "deceased" code in its computer system and reported to various credit bureaus that the card holder was deceased. Defendant Sears did not retain a copy of the unsigned letter it had received.

In May 2002, defendant Sears reported electronically to defendants CSC and Trans Union in conjunction with plaintiff's account that the consumer was deceased. Defendants updated their records to reflect this information. Defendants CSC and Trans Union each published the notation of deceased on a Sears tradeline for plaintiff. (A tradeline is a summary of information reported by a particular creditor about a single consumer line of credit.) After posting the notation, defendants Trans Union, CSC and Equifax each reported activity in some of plaintiff's other joint accounts and defendant Trans Union

received inquiries for plaintiff's credit report. There is no evidence that defendant Trans Union, CSC or Equifax ever received notification from the Social Security Administration that plaintiff was deceased.

B. *Mortgage and Credit History*

In early April 2003, plaintiff contacted Thomas Duffy, a mortgage broker at Provident Mortgage, seeking a conventional thirty-year fixed rate mortgage for $440,000 to purchase a lake house in Webster, Wisconsin. On April 7, 2003, plaintiff applied for a loan and authorized Provident to obtain his merged credit history from defendant Factual Data. The merged history comprised three reports from different credit reporting agencies, including defendants Trans Union and Equifax. The Factual Data report showed that both defendants Trans Union and Equifax had reported the deceased notation. Later, this was shown to be an error; defendant Equifax did not report the deceased notation on the Sears tradeline but instead reported that the account was closed. However, defendant Equifax did not score plaintiff's credit report on the ground that he was deceased. Defendant Factual Data stated on its merged report that defendant Equifax had not provided a score but instead had shown that plaintiff was deceased.

1. *CSC dispute*

Duffy, the Provident mortgage broker, provided plaintiff with a telephone number that he said was for defendant Equifax. Plaintiff called the number to dispute the deceased notation on his credit report. Because plaintiff was a Wisconsin resident, his call was routed to a representative of defendant CSC. In response to his call, defendant CSC sent defendant Sears an automated consumer dispute verification form, stating "PRESENT STATUS INCORRECT. PLEASE VERIFY. CONSUMER STATES NOT DECEASED /

PLEASE PROVIDE STATUS." Defendant Sears replied by instructing defendant CSC to delete the account entirely and defendant CSC did so. On April 22, 2003, defendant CSC wrote plaintiff to inform him that the Sears account tradeline had been deleted. Defendant CSC attached a copy of plaintiff's credit report reflecting the deletion. Plaintiff never asked either defendant CSC or Equifax to reinsert the Sears tradeline into his credit history. When defendant Sears sends a delete message in response to an automated consumer dispute verification request, its computer system is programmed to send the delete message to the other credit reporting agencies to which it provides credit information, in this case, defendant Trans Union and Experian.

2. *Trans Union dispute*

On April 7, 2003, plaintiff sought his credit report and score from defendant Trans Union. Defendant Trans Union sent him its report, which included the notation of deceased next to the Sears account information. The report indicated that plaintiff also went by the name James N. McOwen; the account information that defendant Sears had been providing defendant Trans Union included the name James N. McOwen. Plaintiff was not provided with a credit score; instead the report stated "Not scored: deceased."

On April 16, 2003, plaintiff emailed defendant Trans Union, disputing the address it had listed for him, the alias James N. McOwen, the deceased notation on the Sears account and the indicator of deceased in place of a credit rating. Defendant Trans Union sent plaintiff an email advising him of its dispute procedures, telling him that he could place a one-hundred word statement in his file, which it would assist him in writing, and that he should not apply for credit while his dispute was

pending. Defendant Trans Union removed the disputed previous address and the alias the same day that it received plaintiff's dispute.

To communicate plaintiff's dispute with defendant Sears, defendant Trans Union sent an automated consumer dispute verification form by entering a two-character code ("A–4"). This code produced an automatic written message stating "special comment, compliance condition and/or remarks message disputed. Consumer not liable for acct. (i.e., ex-spouse, business). If liable provide complete ID and ECOA [Equal Credit Opportunity Act] code." In addition, the form indicated that the word "deceased" appeared in the remark field and that the ECOA code contained an "x," which stood for deceased. Defendant Trans Union did not report to defendant Sears that plaintiff had disputed the alias James N. McOwen or the former address that defendant Trans Union had been reporting for him. Its computer system does not enable dispute processors to discover the reporting source of aliases or former addresses.

On April 28, 2003, defendant Sears replied, stating that the account was "verified as reported" and affirming the accuracy of plaintiff's social security number, address, and the indicators of deceased in the remark and ECOA code fields as of the date reported. In the name field at the top of the page, defendant Sears entered an "S" for "same" to show that the name it had on file matched the name defendant Trans Union had on file, James M. McKeown, but at the bottom of the page, it placed a "D" for different to indicate that it had a different middle and last name. Nowhere on this response did defendant Sears state that the name it had on file for the account was James N. McOwen.

On April 29, 2003, defendant Trans Union's computer system processed defendant Sears's response and wrote plaintiff to inform him that it had verified the account information, including the deceased status. Also, defendant Trans Union provided plaintiff with a consumer disclosure report dated April 29, 2003. Defendant Trans Union never called defendant Sears regarding the apparent inconsistency between defendant Sears's verification that the whole name was the same but that the middle initial and the last name were different. Defendant Trans Union knew that plaintiff would not be likely to secure credit with the deceased status on his credit report.

### 3. *Plaintiff's wife's efforts*

On May 4, 2003, plaintiff left his home to go on a business trip to Europe. While he was gone, his wife received the letter that defendant Trans Union had sent, stating that defendant Sears had confirmed the notation of deceased. Upon receiving this letter, plaintiff's wife called defendant Sears directly. The representative with whom she spoke apologized for the inconvenience but explained that plaintiff would have to make the call himself to confirm his identity.

Also during that month, plaintiff's wife contacted the "I–Team," a consumer reporting team for the local news program for a CBS affiliate in Minneapolis, Minnesota, complaining about the credit reporting mix-up. Later that summer, the I–Team produced a television report about how plaintiff's credit report falsely indicated that he was deceased.

### 4. *Finalizing financing*

Because of the deceased notations, plaintiff did not apply for a thirty-year fixed rate mortgage. Instead, he obtained an adjustable rate mortgage under which interest rates are assured for only five years. For the adjustable rate mortgage,

plaintiff did not have to submit a tri-merge credit report to obtain the adjustable rate loan, as he would have for a thirty-year fixed rate mortgage. Accordingly, Duffy submitted only the credit report from Experian only with plaintiff's application. On May 2, 2003, plaintiff closed on the mortgage.

On June 27, 2003, plaintiff applied for additional loans from Community Bank of Cameron–Grantsburg and U.S. Bank, both of which obtained a plaintiff's credit report from defendant Trans Union. Both banks denied plaintiff's loan request. Community Bank denied the application because defendant Trans Union's report did not contain a credit score; instead the report indicated that plaintiff was deceased. (It is disputed whether U.S. Bank's reason for denying this loan was the "deceased" notation on the Trans Union report or because plaintiff had too many other obligations. In the letter that U.S. Bank sent plaintiff, the bank stated that the principal reason for denial of the loan was excessive obligations, Yu Aff., dkt. # 45, ex. A, McKeown Dep., at 38, but a representative of U.S. Bank has testified that the notation was the reason for the denial. Beckholm Aff., dkt. # 58, ¶ 8.)

### E. *Post–Mortgage Inquiries*

On June 27, 2003, plaintiff's wife faxed a letter to defendant Sears's probate office, asking it to remove the notation of deceased from plaintiff's report. On July 2, 2003, defendant Sears removed the notation and faxed plaintiff's wife a letter, advising her that all deceased codes had been removed from the account.

On July 7, 2003, plaintiff contacted defendant Trans Union's consumer contact department to dispute the accuracy of the Sears account information, specifically the two notations of deceased on the account tradeline. Upon learning of the dispute, defendant Trans Union generated a consumer disclosure form for plaintiff and sent defendant Sears a second automated consumer dispute form to investigate the accuracy of the account information. On July 13, 2003, defendant Sears responded by verifying much of the account information but instructing defendant Trans Union to change the remark field from "deceased" to "closed." (Again, defendant Sears reported that its records matched defendant Trans Union's with respect to plaintiff's name as a whole but that the middle initial and last name were different.)

Defendant Trans Union's automated system made no changes to plaintiff's file because defendant Sears's response indicated that the deceased notation should be removed from the remark field but not from the ECOA code field. On July 15, 2003, defendant Trans Union mailed plaintiff a report of the reinvestigation. Defendant Sears changed the ECOA code it provided to defendants Trans Union and Equifax from "consumer deceased" to "individual account" in two universal data forms that it sent on July 14 and 17, 2003. According to its records, defendant Trans Union provided plaintiff's credit report to only two of its subscribers between April 29 and July 31, 2003: Community Bank of Cameron–Grantsburg and U.S. Bank.

On July 22, 2003, plaintiff attorney wrote defendant CSC to dispute the information in the Sears account. In the letter, plaintiff's attorney stated that plaintiff had been denied a mortgage because of a credit report issued by defendant CSC that included the "consumer deceased" notation on the Sears tradeline. He asked defendant CSC to investigate the error. Defendant CSC started an investigation only to discover that the disputed information had already been deleted. On September 4, 2003, it sent plaintiff a letter apprising him of this fact.

### F. *Defendants' Standard Practices*

#### 1. *Trans Union*

Defendant Trans Union has two systems for handling consumer disputes: a consumer dispute verification system and an automated consumer dispute verification process. Through the automated process, defendant Trans Union contacts the creditor reporting the disputed information to request verification that the information provided by the consumer matches the information in the reporting creditors' records. In addition, defendant asks the reporting creditor to verify the accuracy of the remainder of the account information. If the information is verified, defendant Trans Union updates the consumer's file accordingly and notifies the consumer of that fact. If the creditor reports that the information is inaccurate or cannot be verified or it does not report in a given period, it is defendant Trans Union's general practice to delete the information from the consumer's file and notify the consumer. Defendant Trans Union permits consumers with disputes to place a one-hundred word statement into their file and advises them not to apply for credit during the investigation of the dispute.

#### 2. *Defendant CSC*

Generally, defendant CSC investigates consumer disputes by sending an automated consumer dispute verification form to the creditors reporting the information in question. The form advises the creditor of the dispute and the requests for confirmation of the information in its file. In order to comply with Fair Credit Reporting Act guidelines, defendant CSC requires creditors to respond within a specified time frame. If the creditor verifies the information, defendant CSC considers any other information the consumer provides and determines whether a change is warranted. If the creditor reports that the information is incorrect, defendant CSC deletes or modifies the consumer's file as the circumstances dictate. If the creditor does not respond within the given time frame, defendant CSC deletes the information from the consumer's file. Defendant CSC notifies the consumer of the results of the investigation, any changes made to the account and of the right to make a statement regarding the dispute to be placed in the consumer's credit file.

### OPINION

#### A. *Fair Credit Reporting Act*

■ The Fair Credit Reporting Act creates a private right of action against consumer reporting agencies for the negligent or willful violation of any duty imposed under the statute. 15 U.S.C. §§ 1681*o* (negligent violations) and 1681n (willful violations); *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir.1994). A consumer reporting agency that violates the provisions of the act negligently may be liable to the consumer for actual damages, costs and attorney fees. 15 U.S.C. § 1681*o*. Punitive damages may be available when a consumer reporting agency violates the statute willfully. 15 U.S.C. § 1681n.

■ Under the act, a consumer reporting agency is required to follow "reasonable procedures to assure maximum possible accuracy" of the information contained in a consumer's credit report. 15 U.S.C. § 1681e(b). However, the act " 'does not make reporting agencies strictly liable for all inaccuracies.' " *Henson*, 29 F.3d at 284 (quoting *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir.1991)). Thus, a consumer reporting agency will not be liable under § 1681e(b) if it reported inaccurate information on a consumer's credit report, so long as the agency followed "reasonable

procedures to assure maximum possible accuracy." *Id.* at 284.

### I. *Pre-dispute procedures*

#### a. Reasonableness

■ Plaintiff contends that defendants Trans Union, CSC and Equifax violated section 1681e(b) by reporting the two inaccurate notations of deceased on the Sears tradeline on his credit report. Defendants contend that even though they reported this inaccurate information, they are not liable under the act because they maintained "reasonable standards to assure maximum possible accuracy." Generally, the question of the reasonableness of the procedures is a jury question, though there are exceptions when the reasonableness or unreasonableness of the procedures is beyond question. *Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 664 (7th Cir.2001); *Kronstedt v. Equifax,* 01–C–0052–C, 2001 WL 34124783, at *8 (W.D.Wis.2001). In these exceptional cases, the reasonableness issue may be decided as a matter of law.

■ Defendants Trans Union, CSC and Equifax argue that it was reasonable for them to accept information from defendant Sears unless and until they had notice that the accuracy of the information was in question. Underpinning this argument is their assumption that defendant Sears is a presumptively reliable source of credit information. They cite the holding of the Court of Appeals for the Seventh Circuit in *Henson,* 29 F.3d 280, as support for their position. In *Henson,* the court held that consumer reporting agencies are not liable for reporting information from a judgment docket as a matter of law unless the agency has prior notice that the information might be inaccurate. *Id.* at 285. Plaintiff does not address this argument specifically but his responses to a number of proposed finding of fact suggest that he

disputes defendant Sears's reliability as a source of information.

For the same reasons the court found it reasonable as a matter of law to report information found on a court docket in *Henson,* I conclude that it was not unreasonable for defendants CSC and Equifax to report information provided by defendant Sears. In *Henson,* the court noted that "reliance on official court records is unlikely to lead to inaccurate information except in isolated instances." *Id.* at 285. In support of his position, plaintiff cites an internet article about a woman whom defendant Sears reported as deceased to credit reporting agencies and four other cases involving false reporting by defendant Sears. The internet article is inadmissible hearsay for plaintiff's purposes. Even if it were not, plaintiff's evidence amounts to nothing more than isolated incidents. Plaintiff has not shown that the five incidents to which he refers were related. Moreover, these five incidents appear marginal when contrasted with the millions of pieces of credit information that defendant Sears provides to credit reporting agencies. In *Henson,* the court recognized that there would be isolated incidents of misreporting by credit information furnishers. *Id.* at 285 ("reliance on official court records in unlikely to lead to inaccurate credit reporting except in isolated instances.") On this record, no jury could conclude that defendants Trans Union, CSC and Equifax acted unreasonably by reporting information simply because it came from defendant Sears.

However, there are other reasons why it may not have been unreasonable to report the notation of deceased in this case despite the fact that it came from a presumptively reliable source. *Quinn v. Experian Solutions,* 2004 WL 609357, *3 (N.D.Ill. 2004) ("[c]ourts have found that the *Henson* reasoning excuses credit agencies from

independently verifying information provided by credit grantors *unless the credit agency knew or had reason to know that the credit grantor was ... reporting inaccurate information.*") (emphasis added and additional citations omitted). In *Henson,* 29 F.3d at 285, the court noted that a reporting agency is entitled to obtain information from a reliable information absent prior notice of the possible inaccuracy. Plaintiff argues that defendants Trans Union, CSC and Equifax ought to have noticed discrepancies between the notation of deceased and other information in his credit report.

In a similar case, *Sheffer v. Experian Information Solutions, Inc.,* 2003 WL 21710573 (E.D.Pa. July 24, 2003), the court denied a motion for summary judgment brought by a credit reporting agency that had posted an inaccurate notation of deceased on a Sears tradeline. The court found no basis for assuming that defendant Sears was a suspect source of information. Instead, it reasoned that reporting the tradeline was arguably unreasonable because it indicated that the account had been opened four years before the plaintiff was born and because it was the only account among approximately two dozen reporting that the plaintiff was deceased.

Other courts have recognized that receiving inconsistent information may trigger a duty on the part of the credit reporting agency to investigate. In *Bryant v. TRW, Inc.,* 487 F.Supp. 1234, 1242 (E.D.Mich.1980) *aff'd,* 689 F.2d 72 (6th Cir. 1982), the court concluded that receiving apparently inconsistent credit reports may trigger an obligation to investigate on the part of the credit reporting agency. The court reasoned that allowing credit reporting agencies to act as nothing more than mere conduits of information would eviscerate the act's emphasis on reasonable compilation procedures. *Id.*

Similarly, in *Stewart v. Credit Bureau, Inc.,* 734 F.2d 47, 52 (D.C.Cir.1984), the court found that an inference of negligent reporting could be drawn where a credit reporting agency falsely indicated that the plaintiff had filed for bankruptcy under a wage earner plan when the notation was facially inconsistent with the remainder of the plaintiff's credit history showing minimal debt obligation and no substantial delinquency. The court stated expressly that

> [i]nconsistencies within a single file or report involving an inaccuracy as fundamental as a falsely reported wage earner plan, as well as inconsistencies between two files or reports involving less fundamental inaccuracies, can provide sufficient grounds for inferring that an agency acted negligently in failing to verify information.

*Id.* at 52–53; *see also Smith v. Auto Mashers, Inc.,* 85 F.Supp.2d 638, 641 (W.D.Va. 2000) (information not presumptively reliable where "inherently implausible or internally inconsistent").

■ Discrepancies similar to those in *Sheffer* exist in this case. Defendant Sears reported plaintiff as deceased to defendants CSC and Equifax in May 2002. Defendants Trans Union and CSC issued plaintiff's credit history with this notation eleven months later; during the interim, neither the Social Security Administration nor any other creditor indicated that plaintiff was deceased and activity was reported on a number of other tradelines. Defendants attempt to explain away these discrepancies. Defendant Equifax notes that it has no way of cross-referencing the Sears tradeline that reported plaintiff as deceased to other tradelines because "the information for a 'credit report' is not combined until a creditor makes a request for it and then the information is culled from the database." Dft. Equifax's Br., dkt

# 27, at 5. First, § 1681e(b)'s reasonable procedures mandate applies "whenever a consumer reporting agency prepares a consumer report"; it does not dictate the particular procedural mechanisms a reporting agency must use prior to that time. Moreover, the argument misses the point. Defendant Equifax's argument is that in light of the procedures it uses, it is not surprising that the inconsistency went unnoticed. This is hardly a compelling argument. The relevant issue is whether it is reasonable for defendant Equifax to rely on procedures that do not detect this kind of inconsistency.

In addition, defendants note that plaintiff's wife may have been responsible for the activity in plaintiff's other account, as these other accounts were held jointly. Although there may have been a reasonable explanation for the other activity, it is not clear whether it was reasonable for defendants to have *assumed* that plaintiff's wife was responsible, particularly in light of the fact that no other creditor had reported plaintiff as deceased. In determining what is reasonable under the circumstances, the jury must weigh the burden on the credit reporting agencies against the cost to the plaintiff of the potential error. *Crabill,* 259 F.3d at 664; *see also Stewart v. Credit Bureau, Inc.,* 734 F.2d 47, 51 (D.C.Cir.1984) ("Judging the reasonableness of an agency's procedures involves weighing the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy."); *Philbin v. Trans Union Corp.,* 101 F.3d 957, 963 (3d Cir.1996) (same). This is not one of those cases in which summary judgment is appropriate on the ground that the reasonableness of defendants' reporting practices is beyond dispute.

b. Causation

Defendants CSC and Equifax argue alternatively that they are entitled to summary judgment because plaintiff has failed to show that he suffered any actual damages as a result of any credit history report either defendant issued. Actual damages for Fair Credit Reporting Act violations may include out-of-pocket losses, damages for injury to reputation and creditworthiness and for humiliation or mental distress. *Cousin v. Trans Union Corp.,* 246 F.3d 359, 376 (5th Cir.2001). In order to obtain an award of "actual damages," a plaintiff must present evidence showing a "causal relation between the violation of the statute and the loss of credit, or some other harm ...." *Crabill,* 259 F.3d at 664. Defendants CSC and Equifax argue that plaintiff was able to secure a mortgage for the property he sought to purchase and that the lender never saw a credit report that either had issued.

Plaintiff argues that he was forced to accept a five-year adjustable-rate loan rather than the thirty-year fixed-rate mortgage that he sought because the five-year loan could be obtained by using the single credit history from Experian, the single credit reporting agency that had not reported plaintiff to be deceased in the information it provided Factual Data. (The notation of deceased on the Sears tradeline on the merged credit report from Factual Data came from defendant Trans Union and not from defendants CSC or Equifax. However, defendant Equifax did report to defendant Factual Data that plaintiff was deceased in place of providing a credit score for him. Factual Data noted this on its report.)

Plaintiff maintains that he had no choice but to accept the five-year mortgage; however, his evidence belies this assertion. According to plaintiff's wife, "the best thirty-year rate that was available to us was at 5.625%. [Plaintiff] declined that option." Joan McKeown Aff., dkt. # 65, ¶ 22. In addition, she testified that the rates for the

loan plaintiff accepted instead were 4.125% for five years, followed by then current interest rates not to exceed 9.125%. Plaintiff has not pointed to any evidence showing what kind of interest rate he might have obtained had it not been for the notation of deceased. In support of his proposed finding of fact that he was "forced to close his mortgage on less favorable terms because he was limited to those types of loans that could be obtained with a credit report from only Experian," plaintiff cites the affidavit of his mortgage broker, Thomas Duffy, in which Duffy states only that the terms of the adjustable rates loan were "quite different" from those of a traditional thirty-year loan. PPFOF, dkt. # 55, at 7, ¶ 58 (citing Duffy Aff., dkt. # 57, ¶¶ 17–19). Plaintiff has not adduced any evidence from which a jury could approximate the value of the risk. It is only speculation that market rates may be less favorable in five years. Because plaintiff has failed to show that he could support his assertion that his mortgage terms are less favorable than those he would have been able to obtain had it not been for the deceased notations, he will not be allowed to seek damages on this basis.

■■■ Plaintiff contends that even if he cannot prove that he obtained less favorable loan terms, he should be able to recover actual damages for his mental distress, loss of sleep, nervousness and injury to reputation, work, family and sense of well being. "[A] denial of credit is not a necessary prerequisite for a § 1681e(b) claim"; damages for emotional distress may also be compensable. *Kronstedt v. Equifax, CSC,* 2001 WL 34124783, at *11 (W.D.Wis.2001). *See also Cousin,* 246 F.3d at 369 n. 15; *Guimond v. Trans Union Credit Information Co.,* 45 F.3d 1329, 1333 (9th Cir.1995).

■■■ First, defendant CSC contends that plaintiff's evidence of emotional distress is conclusory and therefore, insuffi-

cient. I disagree. In order to survive summary judgment on an emotional distress claim, a plaintiff must submit evidence that " 'reasonably and sufficiently explains the circumstance of his injury and does not resort to mere conclusory statements.' " *Kronstedt,* 2001 WL 34124783, at *12 (quoting *United States v. Balistrieri,* 981 F.2d 916, 932 (7th Cir.1992)). Plaintiff has submitted an affidavit from his wife, chronicling a change in plaintiff's behavior (subdued, stunned and distracted behavior), physical manifestations (flushing), restless sleeping between the time he learned of the notation of deceased until the mortgage closed and anxiety about the possibility of other credit errors, such as having a credit card denied in front of a business associate. PPFOF, dkt. # 55, at 10, ¶ 78 (citing Joan McKeown Aff., dkt. # 64, ¶¶ 11–18, 19–26, 45–50 and 63–75). This evidence is far more specific than the testimony that other courts have held to be too conclusory, *e.g., Cousin,* 246 F.3d at 370–71 (plaintiff testified that he felt "very upset [and] angry"); *Schmit v. Trans Union LLC,* 2004 WL 785098, at *4 (N.D.Ill. April 12, 2004) (blank assertion of emotional distress and no evidence linking it to erroneous report), and, in fact, is more specific than evidence found to be sufficiently particular, *e.g., Kronstedt,* 2001 WL 34124783, at *12 (description of depth of frustration). In making its argument, defendant CSC relies on case law setting out standards for evaluating evidence " 'when the injured party provides the sole evidence of mental distress.' " Dft. CSC's Br., dkt. # 36, at 12–14 (quoting *Biggs v. Village of Dupo,* 892 F.2d 1298, 1304 (7th Cir.1990)). Notably, defendant CSC does not address the testimony of plaintiff's wife to which plaintiff referred in his proposed findings of fact relating to his alleged mental distress.

■ Next, defendant CSC argues that damages for emotional distress under the act " 'must result from the publication of the inaccurate information to a third party.' " *Id.* at 10 (quoting *Sarver v. Experian Information Solutions, Inc.,* 299 F.Supp.2d 875, 877 (N.D.Ill.2004)). Defendant relies on the holding in *Casella v. Equifax Credit Information Services,* 56 F.3d 469 (2d Cir.1995). In rejecting the testimony of the plaintiff and his companion regarding the apprehension and anxiety that the plaintiff felt over the prospect of dealing with the erroneous report, the court held that "a plaintiff can [not] recover for pain and suffering when he has failed to show that any creditor or other person ever learned of the derogatory information from a credit reporting agency." *Id.* at 475. The court derived its rule from the requirement that a plaintiff show that the defendant's actions caused the injury. To the extent that this rule relates to emotional distress caused by the embarrassment, I agree with it. A defendant cannot be held liable for the embarrassment a party suffers as a result of others learning of the derogatory information unless that defendant is responsible for their finding out. (For example, plaintiff cannot recover for the embarrassment he alleges to have suffered because a number of people in his community knew about the situation; they learned of the deceased notation from a television story that plaintiff's wife instigated and not from any defendant.)

However, it makes no sense to apply this requirement to other types of emotional distress. A consumer may suffer distress if he has difficulty in correcting his credit history or trouble managing his finances until his history is corrected; this is true regardless whether his erroneous information was actually published to a third party. The holding in *Casella* implies that recoverable emotional distress is limited to that caused by embarrassment or humiliation, *id.* at 475 (party cannot recover emotional distress damages "simply because he knew of an inaccurate and potentially damaging item in his credit report"; rejecting testimony about depression and anxiety suffered as a result of dealing with error), but the court provided no explanation for such a limitation. Other courts have routinely assumed or suggested that emotional distress damages are available when a party experiences a significant frustration and anxiety brought on by failed attempts to have the errors corrected. *See, e.g., Cousin,* 246 F.3d at 369 n. 15 (suggesting that recovery is available for mental distress other than embarrassment); *Guimond v. Trans Union Credit Information Co.,* 45 F.3d 1329, 1332 (9th Cir.1995) (emotional distress "resulting from the incorrect information in her credit report"; no indication of publication to third party); *Stevenson v. TRW, Inc.,* 987 F.2d 288, 297 (5th Cir.1993) (emotional distress resulting from shock of learning of bad credit record); *Kronstedt,* 2001 WL 34124783, at *12 (frustration over repeated failed attempts to have error corrected). I can think of no reason for allowing consumers to recover for the humiliation and embarrassment of having bankers and mortgage brokers learn of the derogatory credit information while barring them from recovering for the anxiety and stress they may encounter in coping with the error.

■ In this case, plaintiff relies on the testimony of his wife regarding the frustration and anxiety he suffered for fear that he would lose the property he wished to purchase and that the error might cause other credit related problems. Although it is difficult to imagine that plaintiff suffered much emotional distress as a result of the notation of deceased reported by defendants CSC and Equifax when only a week elapsed between the time that plaintiff learned that he had been reported as de-

ceased and defendant CSC informed him that it had deleted the Sears tradeline, "evaluation of plaintiff's emotional distress claim is a task best left to the jury." *Kronstedt*, 2001 WL 34124783, at *13.

(Of course, in this case, the deceased notation was published to a third party: Duffy. This third party publication exemplifies the absurdity of applying the rule that the erroneous information must be published to a third party on claims of mental distress not arising out of embarrassment. None of plaintiff's stress is derived from the fact that Duffy knew of the notation; if anything, Duffy alleviated the stress by quickly finding an alternative loan to finance plaintiff's purchase. Even if the erroneous notation had been published broadly, it is difficult to conceive how this would have lead to emotional distress; anyone plaintiff may have encountered would have known that he was not deceased and therefore, that the notation was in error.)

### 2. *Reinvestigation procedures*

#### a. Reasonableness

 Once a consumer notifies the consumer reporting agency of an error on his credit report, § 1681i obligates the agency to conduct a more thorough investigation. § 1681i(a) states in relevant part:

> If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30–day period beginning on the date on which the agency receives the notice of the dispute from the consumer.

Defendant CSC explained why its response to plaintiff's complaint was reasonable without appearing to notice that plaintiff had not brought a claim against it or defendant Equifax under § 1681i. Although plaintiff alleged that these defendants violated § 1681e(b) by "allowing the error to remain as part of plaintiff's credit file despite plaintiff having disputed the accuracy of the tradelines," *id.* at ¶¶ 108 and 109, it is undisputed that defendant CSC deleted the tradeline shortly after plaintiff disputed it. Plaintiff does not argue that defendants CSC and Equifax acted unreasonably in handling his complaint. Plt.'s Br., dkt. # 50, at 8. *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir.1999) ("Arguments not developed in any meaningful way are waived."). To the extent that plaintiff may have intended to charge defendants CSC and Equifax with responding to his dispute unreasonably, he has waived that claim by failing to develop it or to proffer evidence to support it.

Plaintiff's claim that defendant Trans Union acted unreasonably in responding to his dispute is complicated by the arguable overlap between § 1681e(b), which by its terms applies "whenever a consumer reporting agency prepares a consumer report" and § 1681i, which dictates a reporting agency's obligations upon receiving a consumer dispute. In *Kronstedt*, I noted that "because § 1681i provides its own set of procedures for reinvestigating disputed information, it is debatable whether § 1681e(b)'s 'maximum possible accuracy' standard apples to reinvestigation procedures." 2004 WL 34124783, at *8. However, it was unnecessary to resolve this question in *Kronstedt* because both parties assumed that § 1681e's standard applied. The same is true in this case. In addition, both parties appear to assume that § 1681i's standards are more stringent

than those governing § 1681e(b). Dft. Trans Union's Br., dkt # 31, at 9 (meeting § 1681i standard is per se compliance with § 1681e(b)); Plt.'s Br., dkt. # 50, at 5 (upon receiving consumer dispute, "a credit reporting agency has the added and more specific duties of 15 U.S.C. § 1681i"). Thus, for the purpose of deciding this motion, I will assume that compliance with § 1681i satisfies § 1681e(b). *See Quinn,* 2004 WL 609357, at *3 ("because [defendant] satisfied its reinvestigation obligation under § 1681i(a), its procedures were reasonable to assure maximum possible accuracy under § 1681e(b)").

▇ In essence, defendant Trans Union's argument is that its reinvestigation was reasonable because it submitted an automated consumer dispute verification to defendant Sears, which confirmed the disputed information in its reply. First, in making this argument, defendant Trans Union's ignores one of the bases for plaintiff's claim: that defendant Trans Union failed to investigate his dispute regarding the alias "James N. McOwen" or the former address that it had listed for plaintiff. Although it appears that defendant Trans Union may not have reinvestigated this information because its computer system does not allow a complaint examiner to determine the source of aliases or former address, defendant Trans Union may be violating § 1681e(b)'s maximum possible accuracy standard by adhering to a system that does not provide this capability. In any event, defendant Trans Union has not explained why its failure to conduct a reinvestigation of these two disputes was not a violation of the act. Denial of its motion is warranted on this ground alone.

▇ Second, depending on the circumstances, a credit reporting agency that receives notice of a dispute may be required to go beyond the original source of the disputed information to verify its accuracy. *Henson,* 29 F.3d at 287; *see also*

*Cahlin,* 936 F.2d at 1160 ("A [§ 1681i(a)] claim is properly raised when a particular credit report contains a factual deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry."). The two relevant factors are "whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable" and "the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." *Id.* Generally, "the trier of fact must weigh the above mentioned factors in deciding whether [the defendant] violated the provisions of section 1681i." *Henson,* 29 F.3d at 287.

According to defendant Trans Union, it had no obligation as a matter of law to do more than rely on the information it received from defendant Sears because none of the record evidence suggests that it knew or should have known that defendant Sears's information was not trustworthy. But as plaintiff suggests, defendant Trans Union had at least one reason to know: defendant Sears's response to the automated consumer dispute verification contained an internal inconsistency. Defendant Sears verified plaintiff's name as a whole but reported that the middle initial and last name that defendant Trans Union submitted did not match the one on the account. *Cf. Stewart,* 734 F.2d at 52–53 (failing to verify inconsistent information as basis for inferring negligence). Again, it is for the trier of fact to balance the weight of this reason to know in light of the cost to defendant Trans Union of further investigation and the harm to plaintiff of having the error remain on his credit history. *Henson v. CSC Credit Services,* 29 F.3d 280, 287 (7th Cir.1994).

b. Causation

Alternatively, defendant Trans Union argues that it cannot be held liable for its handling of plaintiff's second dispute, which he submitted on July 7, 2003, because plaintiff suffered no damages as a result of it. I agree that plaintiff cannot recover for any denial of credit or credit obtained at a less favorable rate because there is no evidence that he applied for credit between the time he lodged his complaint and the time that defendant Trans Union removed the Sears tradeline. However, plaintiff may be able to recover for emotional distress, see McKeown Aff., dkt # 64 at ¶¶ 62–65 (plaintiff experienced emotional distress throughout summer) and for the reasons explained below, defendant Trans Union may be liable for punitive damages for failing to delete the deceased notation in the remark field after defendant Sears instructed it explicitly to do so.

3. *Credit information furnisher obligations*

 In 1996, Congress amended the Fair Credit Reporting Act to impose duties upon persons, such as defendant Sears, who furnish information to credit reporting agencies. 15 U.S.C. § 1681s–2. Upon notice of a dispute from a credit reporting agency, § 1681s–2(b)(1) requires the entity furnishing the information to conduct an investigation regarding the dispute and to report its findings accordingly:

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall -

(A) conduct an investigation with respect to disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2);

(C) report the results of the investigation to the consumer reporting agency; and

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s–2(b)(1). The duties imposed on providers of information under § 1681s–2(b) arise only after the entity furnishing the information receives notice from a consumer reporting agency that a consumer is disputing credit information. *Kronstedt*, 2001 WL 34214783, at *16. A consumer may bring a cause of action against an entity furnishing information for a violation of this subsection. *Id*; *Dornhecker v. Ameritech Corp.*, 99 F.Supp.2d 918, 926–27 (N.D.Ill.2000).

Although the statute does not say so expressly, I concluded in another case that § 1681s–2(b)(1) implies a reasonableness standard for conducting investigations. *Kronstedt*, 2001 WL 34124783, at * 16. Although the Court of Appeals for the Seventh Circuit has not yet addressed the issue, a number of other courts that have done so have reached the same conclusion. *Johnson v. MBNA America Bank NA*, 357 F.3d 426, 430–31 (4th Cir.2004); *Agosta v. Inovision, Inc.*, 2003 WL 22999213, at *5 (E.D.Pa.Dec.16, 2003); *Buxton v. Equifax Credit Info. Servs., Inc.*, 2003 WL 22844245, at *2 (N.D.Ill.Dec.1, 2003); *Wade v. Equifax*, 2003 WL 22089694, at *2–3 (N.D.Ill. Sept.8, 2003); *Betts v. Equifax Credit Information Services, Inc.*, 245 F.Supp.2d 1130, 1135 (W.D.Wash.2003); *Olwell v. Medical Information Bureau*, 2003 WL 79035, at *5 (D.Minn. Jan.7, 2003). Defendant Sears does not dispute the applicability of a reasonableness standard but argues that it is entitled to judg-

ment nevertheless because no reasonable jury could find its investigation and response to plaintiff's disputes to be "unreasonable."

### a. April 2003: Trans Union dispute

In its brief in support of its motion for summary judgment, defendant Sears does not address its investigation and response to the dispute notification that defendant Trans Union sent in April 2003. Plaintiff's claim was clearly based on his April dispute with defendant Trans Union, Cpt., dkt. # 2, at 8–9, ¶¶ 39, 40, 117. He discussed defendant Sears's treatment of this dispute at length in his brief opposing defendant Sears's motion for summary judgment, Plt.'s Br., dkt # 50, at 10. In its reply brief, defendant Sears discusses its response to this dispute in a footnote. *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir.1998) (arguments raised for first time in reply brief are waived). It concedes that its operator handling the dispute should have removed the deceased code and directed the deletion of the account but does not know why the operator failed to do so. Despite this concession, defendant Sears argues that it had reasonable procedures in place that should have resulted in the removal of the code.

■ First, § 1681s–2(b) requires credit information furnishers to conduct reasonable investigations. Defendant Sears does not point to any authority supporting its assumption that simply having reasonable procedures for conducting investigations satisfies § 1681s–2(b)(1). If Congress had intended to create a "reasonable procedures" standard for credit information furnishers under § 1681s–2(b)(1), it knew how to do so. *Cf.* 15 U.S.C. §§ 1681e(b). However, the parties have not briefed this issue and I need not decide it. Even if I were to accept defendant Sears's assumption, defendant has neither explained what its normal procedures are and why they

are reasonable as a matter of law nor made its normal procedures a subject of its proposed findings of fact. *See Procedure to be Followed on Motions for Summary Judgment*, I.B.3, *attached to* Preliminary Pretrial Conference Order, dkt. # 21 (statements of proposed findings of fact must include all propositions a party deems necessary to show entitlement to judgment in its favor).

### b. April 2003: defendants CSC's and Equifax's dispute

Defendant Sears argues with respect to its investigation and response to the April dispute notification from defendants CSC and Equifax that it acted reasonably in light of its history of communications with plaintiff's wife. It fails to note that the only communication it had with plaintiff's wife, as described in the proposed findings of fact, took place after April 2003. In addition, defendant Sears suggests that the reasonableness of its actions is shown by its advice to defendants CSC and Equifax to delete the tradeline. § 1681s–2(b) creates an obligation to conduct a reasonable *investigation* and to report the results thereof. The fact that defendant Sears directed the deletion of the account says nothing about the steps it took in investigating plaintiff's dispute. Moreover, it is not clear that directing deletion constitutes "report[ing] the results of the investigation." 15 U.S.C. § 1681s–2(b)(1)(C). In its reply brief, defendant Sears provides a number of reasons why it was reasonable for it to direct defendants CSC and Equifax to delete the account: both the information defendants CSC and Equifax provided and the information defendant Sears had for the account indicated "paid account/zero balance/closed" and its account notes indicated that it had received a notice stating that the account holder was deceased. Again, defendant Sears failed to make this information the subject of

proposed findings of fact. Even if it had, this evidence does not show that defendant Sears actually did conduct an investigation, that it discovered these facts as a result of that investigation and that this information was the reason it directed defendants CSC and Equifax to delete the account.

 Defendant Sears asserts that in directing deletion, it was "exercis[ing] its right not to report on the account." To the extent that defendant Sears suggests that directing deletion pursuant to a right not to report information is in and of itself an adequate response to a notice of dispute under § 1681s–2(b)(1), I disagree. The act's purpose is to protect *both* consumers *and* the consumer credit industry. 15 U.S.C. § 1681(b). If credit information furnishers simply resorted to a "right not to report" as a means of avoiding the cost of conducting an investigation and potential liability to the consumer for failing to do so reasonably, consumers could too easily manipulate their credit histories by disputing bad but accurate credit information. Once an information furnisher supplies information and receives notification of a consumer dispute, it may not avoid § 1681s–2(b)(1)(a)'s clear directive to conduct an investigation of the disputed information by opting not to report the information at that time. This is not to say that the creditor must continue reporting the account; it is to say only that discontinuing its reporting is not an alternative to the act's investigation requirement.

c. July 2003: Trans Union dispute

Defendant Sears's arguments with respect to plaintiff's July 2003 dispute to defendant Trans Union fail for similar reasons. Again, defendant Sears assumes that the reasonableness of its investigation (assuming that there was one) is beyond dispute because it removed the deceased notation from the comment field. But again, defendant Sears's proposed findings of fact do not shed light on what if any steps it took *investigating* plaintiff's disputes. *Cf. Betts,* 245 F.Supp.2d at 1135 (summary judgment inappropriate where there is a genuine issue whether information furnisher conducted any investigation at all).

d. Damages

 In its reply brief, defendant Sears argues that none of plaintiff's damages were based on its responses to the April 2003 dispute from defendants CSC and Equifax or its handling of his dispute to defendant Trans Union in July 2003. Ordinarily, arguments raised for the first time in a reply brief are waived. *James,* 137 F.3d at 1008. However, the purpose of this rule is to insure that the opposing party has an opportunity to respond to the argument. In this case, plaintiff was afforded that opportunity; other defendants challenged his ability to prove that he had suffered damages as a result of the deceased notation. Plt.'s Br., dkt. # 50, at 11–14. In fact, plaintiff addressed defendant Sears's potential damage liability expressly. *Id.* at 13. Because the issue is fully briefed, I will make an exception in this instance and address these arguments.

 Plaintiff will not be able to recover damages for the difference in interest rate he might have obtained had it not been for the notation of deceased and the rate on the loan he actually obtained; plaintiff failed to proffer evidence showing that the loan he accepted was not as favorable as what he would have obtained otherwise. Plaintiff will not be able to recover emotional distress damages for defendant Sears's handling of the April 2003 dispute it received from defendants CSC and Equifax. There is no evidence that plaintiff knew anything about the manner in which defendant Sears handled the dispute. Further, defendant Sears directed

defendants CSC and Equifax to delete the tradeline; they did so; and plaintiff was notified accordingly.

■ Defendant Sears may be liable for emotional distress caused by defendant Sears's handling of the disputes plaintiff submitted through defendant Trans Union in April and July 2003. In response to both disputes, plaintiff received letters stating that defendant Sears had confirmed him to be deceased. Plaintiff has submitted sufficiently specific evidence demonstrating that he was agitated and embarrassed because he had not been able to have the error corrected. McKeown Aff., dkt. # 64, at ¶¶ 15–16. In addition, defendant Sears may potentially be liable for punitive damages for the reasons explained below.

### 4. *Punitive damages*

■ Plaintiff brought all of his fair credit reporting act claims under both 15 U.S.C. §§ 1681*o* and 1681n. As noted above, when a consumer reporting agency violates the act negligently, it may be liable to the consumer for actual damages, costs and attorney fees under § 1681*o*. § 1681n provides for statutory damages of not less than $100 and not more than $1,000 when the violation is willful. To show willful noncompliance, a plaintiff must show that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir.1986), *quoted with approval in Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409 (4th Cir.2001); *Philbin*, 101 F.3d at 970. A showing of malice or evil motive is not required to prove willfulness under the act. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226–27 (3rd Cir.1997); *Stevenson v. TRW, Inc.*, 987 F.2d 288, 294 (5th Cir.1993).

### a. Defendants CSC and Equifax

■ In his complaint, plaintiff alleged that defendants CSC and Equifax willfully violated § 1681e(b) in failing to follow reasonable procedures to assure maximum possible accuracy. Cpt., dkt. # 2. at 20, ¶ 108. However, in his combined brief opposing all four motions for summary judgment, he argues that a jury could conclude that the acts of defendants Trans Union and Sears were willful. Plaintiff does not suggest that punitive damages would be available against defendants CSC and Equifax. *Id.* Defendant Equifax challenged plaintiff's punitive damages claims expressly, Dft. Equifax's Br., dkt.# 27, at 8–9, and defendant CSC did so impliedly by arguing that summary judgment was warranted on the grounds that plaintiff could not recover damages, Dft. CSC Br., dkt. # 36, at 7–14. By failing to respond to these challenges or develop an argument that would support his allegation, plaintiff has waived his § 1681n claims against defendants CSC and Equifax.

### b. Defendant Trans Union

Plaintiff advances two grounds for his punitive damages claim against defendant Trans Union: (1) its failure to transmit plaintiff's dispute regarding the listed alias and former address to defendant Sears; and (2) its failure to remove the notation of deceased after defendant Sears instructed it expressly to do so. Defendant Trans Union argues that plaintiff's claim under § 1681n against it must fail because plaintiff has admitted that to his knowledge defendant Trans Union has never concealed any information from him or misrepresented anything to him. The Court of Appeals for the Fifth Circuit has said that "[o]nly defendants who have engaged in 'willful misrepresentations or concealments' have committed a willful violation and are subject to punitive damages under

§ 1681n." *Stevenson,* 987 F.2d at 294 (quoting *Pinner,* 805 F.2d at 1263). Other courts have allowed punitive damages claims without adopting this limitation. *Cushman v. Trans Union Corp.,* 115 F.3d 220, 226–27 (3d Cir.1997) (citing *Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 834 (8th Cir.1976); *Collins v. Retail Credit Co.,* 410 F.Supp. 924, 931–32 (E.D.Mich. 1976)); *see also Cousin,* 246 F.3d at 372 (noting that punitive damages claims "typically" involve misrepresentations or concealments but not adopting such a limitation). The Court of Appeals for the Third Circuit declined to adopt this limitation expressly, but held that "a defendant's actions must be on the same order as willful concealments or misrepresentations." *Cushman,* 115 F.3d at 227.

█ The Court of Appeals for the Seventh Circuit has noted only that punitive damages are available when a credit reporting agency violates the act willfully. *Henson,* 29 F.3d at 284. It has not addressed the possibility that § 1681n is limited to claims of willful concealment or misrepresentations. I agree with those courts holding that willful acts need be only on the order of intentional concealments or misrepresentations. *See Kronstedt,* 2001 WL 34124783, at *14. The Fifth Circuit's limitation appears to have been derived from the simple observation that early cases under the act allowing punitive damages happened to involve concealments or misrepresentations. *Stevenson,* 987 F.2d at 294 (citing *Pinner,* 805 F.2d at 1263 for limitation); *Pinner,* 805 F.2d at 1263 (noting that "[i]n each case where punitive damages have been allowed the defendant's conduct involved willful misrepresentations or concealments.").

█ With respect to plaintiff's argument that defendant Trans Union violated the act willfully by failing to transmit plaintiff's dispute regarding the listed alias and former address to defendant Sears, the evidence shows that these two disputes were not communicated to defendant Sears because defendant Trans Union's computer system does not keep track of the source of this information. Plaintiff contends that defendant Trans Union may be held liable for willfully choosing a system that did not permit this capability, but all procedures are willfully implemented; under plaintiff's theory, every violation of § 1681e(b) would result in punitive damages liability. Punitive damages are available for willful violations, not simply willful actions. *Phillips v. Grendahl,* 312 F.3d 357, 368 (8th Cir.2002) (statute's language imports requirement that defendant know conduct is unlawful); *Dalton v. Capital Associated Indus., Inc.,* 257 F.3d 409, 418 (4th Cir.2001) ("knowingly and intentionally committed an action in conscious disregard for the rights" of consumer).

█ Nonetheless, there is at least an issue of fact whether defendant Trans Union's implementation of this system involved a willful violation. In a nearly identical case, the United States District Court for the District of Minnesota held that a credit reporting agency made a policy decision not to record the source of the address and that "[t]he decision to design such a system may constitute an intentional act that [the defendant] *knew was in violation of the FCRA's requirement that it follow reasonable procedures to assure maximum possible accuracy of the information ...."* *Graham v. CSC Credit Services, Inc.,* 306 F.Supp.2d 873, 881 (D.Minn.2004) (emphasis added). Of course, a reporting agency cannot be said to knowingly violate a provision mandating reasonable procedures unless the unreasonableness is sufficiently obvious. As noted above, determining reasonableness involves a fact-specific balancing of a number of factors, including the cost to the credit reporting agency.

On this record, there is no evidence of what it might cost defendant Trans Union to track the sources of former addresses and aliases. Such recordation would benefit consumers by making possible more thorough investigations of their disputes. In this case, the challenged alias may have come from defendant Sears. If it had, defendant Trans Union presumptively would have transmitted plaintiff's dispute regarding the alias to defendant Sears, alerting the operator that confirmed that "James N. McOwen" and "James M. McKeown" were one and the same. Viewing this evidence in the light most favorable to plaintiff, a jury could conclude that defendant Trans Union knew that it was unreasonable to implement a system that failed to record the source of addresses and aliases.

Additionally, plaintiff may be entitled to punitive damages on the grounds that defendant Trans Union did not remove the notation of deceased even after defendant Sears instructed it to do so. Defendant Trans Union's explanation is that its computer system processed defendant Sears's response and because the ECOA code indicated that plaintiff was deceased, the system apparently ignored or overrode the direction that the remark field be changed from "deceased" to "closed." Dft. CSC's Br., dkt. # 31, at 10–11. § 1681i(5)(A) provides

> If, after any reinvestigation … of any information disputed by a consumer, an item of the information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation.

■ The facts on this record suggest that defendant Trans Union's computer system automatically resolves conflicting information in favor of finding confirmation; there is no indication that the system flags conflicting information for review. Dft. CSC's PFOF, dkt. # 32, ¶¶ 47–48; Hickman Aff., dkt. # 33, ¶¶ 41–42. Plaintiff disputed the deceased notation in the remarks field; defendant Sears did not verify this remark but instead instructed it to be changed to "closed"; and defendant Trans Union's system was programmed in such a way that this direction was ignored. § 1681i(5)(A) provides that credit reporting agencies must delete information disputed by a customer that is found to be inaccurate or cannot be verified. Again, a jury could conclude that by adopting a system that ignored an express direction from a credit information furnisher to change information that a consumer had disputed, defendant Trans Union knowingly violated the act's reasonable procedures standard.

c. Defendant Sears

■ On the present record, I must allow plaintiff to go forward with his punitive damages claim against defendant Sears. As discussed above, defendant Sears did not propose as fact that it conducted any investigation at all in response to any of the three disputes plaintiff raised. In deciding motions for summary judgment, all inferences must be drawn in the manner most favorable to the non-moving party. Without any evidence of an investigation, I must assume that none was made. It may well be that this lack of evidence is attributable merely to oversight. However, it would be improper to assume that it was. In the event that defendant Sears did not investigate any of plaintiff's disputes, it may be liable for punitive damages. Accordingly, plaintiff may be entitled to punitive damages against defendant Sears, but only if he convinces the jury that defendant Sears

conducted no investigation or that it conducted an investigation knowing it to be inadequate. *Cf. Bryant v. TRW, Inc.*, 487 F.Supp. 1234, 1239 (D.C.Mich.1980) (failure to conduct reinvestigation is ground to send punitive damages question to jury in § 1681e(b) context); *Stevenson*, 987 F.2d at 294 (plaintiff not entitled to punitive damages where defendant investigated dispute among other things).

In addition, plaintiff argues that defendant Sears may be liable for punitive damages for responding differently to the two April 2003 dispute notices. Although the inconsistency may be grounds for inferring negligence, there is no evidence indicating that there was any willfulness in responding to defendant Trans Union differently. Accordingly, plaintiff will not be able to seek punitive damages by arguing that defendant Sears violated the act willfully by responding differently to different dispute notices.

### B. *State Law Claims*

Plaintiff contends that each defendant is liable under state law for credit defamation and tortious interference with credit expectancy. In addition, plaintiff has asserted a claim against defendant Sears for intentional invasion of privacy. Defendants Trans Union, CSC and Equifax argue that plaintiff's state law claims against them are preempted by 15 U.S.C. § 1681h(e). Defendant Sears has argued that plaintiff has proffered insufficient evidence to support his tortious interference and invasion of privacy claims.

### 1. *Preemption under § 1681h(e)*

■ The Fair Credit Reporting Act preempts state law defamation and negligent reporting claims unless a plaintiff proves "malice of willful intent to injure such consumer." 15 U.S.C. § 1681h(e). Specifically, the act provides as follows:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

*Id.* In arguing that § 1681h(e) does not preempt his state law claims, plaintiff asserts that his claims are not based on a disclosure made "pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report." Sections 1681g and 1681h require credit reporting agencies to disclose credit information *to consumers* upon consumers' request, whereas section 1681m requires users of consumer reports to disclose information to consumers against whom they have taken adverse actions. Under plaintiff's interpretation, the provision bars defamation claims only when they arise out of disclosures to the plaintiff. Plaintiff asserts that his claims are based on disclosures to third parties.

■ As defendant CSC aptly notes, plaintiff's construction would render § 1681h(e) essentially meaningless. All defamation claims arise out of disclosures to third parties; it is a prima facie element of the claim. *Hart v. Bennet*, 2003 WI App 231, ¶ 21, 267 Wis.2d 919, 672 N.W.2d 306; *Restatement (Second) of Torts* § 558 (1977). Under plaintiff's construction, the

provision would bar only those defamation claims that would fail as a matter of law. Moreover, plaintiff's construction is not supported by the language of the provision, which bars claims based on *"information* disclosed pursuant to section 1681g, 1681h, or 1681m" and not claims based on the disclosure itself.

■ Defendant Trans Union was acting pursuant to § 1681g when it disclosed the erroneous information on which plaintiff's claims are based. This section requires that upon request, a reporting agency must disclose to a consumer the information in that consumer's file. On April 7, 2003, plaintiff sought his credit report and score from defendant Trans Union. Defendant Trans Union sent him its report, which included the deceased notation next to the Sears account information. Plaintiff contends that even if § 1681h(e) applies, his claims are not barred because a jury could find that defendant Trans Union exhibited a reckless disregard for the truth. But the statute imposes an even higher burden of malice or willful intent to injure; plaintiff's evidence does not support such a finding.

Conversely, there is no evidence that either defendant CSC or defendant Equifax ever made a disclosure pursuant to one of these sections. The only disclosure either of these defendants made to plaintiff was on April 22, 2003. Defendant CSC wrote plaintiff a letter stating that the deceased notation had been deleted and attached a copy of his credit report, but it made this disclosure pursuant to § 1681i(a)(6)(B)(ii), which provides that a consumer reporting agency must provide a consumer with a report "based upon the consumer's file as that file is revised as a result of the reinvestigation" within five days after the reinvestigation has been completed. Because there is no indication that either defendant CSC or Equifax ever made a disclosure to plaintiff under

§§ 1681g, 1681h, or 1681m, I cannot conclude that plaintiff's state law claims against them are preempted by § 1681h(e). Neither defendant argued any other reason why it is entitled to summary judgment on these claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (defendant has initial burden to explain basis for entitlement to judgment as a matter of law).

2. *Invasion of privacy and tortious interference with credit expectancy claims against defendant Sears*

■ Unlike the other defendants, defendant Sears argued that it was entitled to judgment on the merits for plaintiff's invasion of privacy and tortious interference with credit expectancy claims. Plaintiff failed to respond to these arguments in opposing defendant Sears's motion. In failing to do so, he waived the invasion of privacy and tortious interference with credit expectancy claims he brought against defendant Sears. These claims will be dismissed. (Plaintiff brought a state law claim of credit defamation against defendant Sears. Although defendant Sears formally moved for summary judgment with respect to this claim, Dft. Sears's Mot. Summ. J., dkt. # 41, at 1, it failed to explain why it is entitled to judgment. Dft. Sears's Br., dkt. # 42. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548 (defendant has initial burden to explain basis for entitlement to summary judgment).)

## ORDER

IT IS ORDERED that

1. Defendant Trans Union LLC's motion for summary judgment is DENIED with respect to plaintiff's Fair Credit Reporting Act claim and GRANTED with respect to plaintiff's claims of credit defamation and tortious interference with credit expectancy;

2. Defendant Equifax Inc. d/b/a Equifax Information Services, LLC's motion for summary judgment is DENIED with respect to plaintiff's Fair Credit Reporting Act claim arising under 15 U.S.C. § 1681o, credit defamation claim and tortious interference with credit expectancy claim and GRANTED with respect to plaintiff's Fair Credit Reporting Act claim arising under 15 U.S.C. § 1681n;

3. Defendant CSC Credit Services, Inc.'s motion for summary judgment is DENIED with respect to plaintiff's Fair Credit Reporting Act claim arising under 15 U.S.C. § 1681o, credit defamation claim and tortious interference with credit expectancy claim and GRANTED with respect to plaintiff's Fair Credit Reporting Act claim arising under 15 U.S.C. § 1681n; and

4. Defendant Sears Roebuck & Co.'s motion for summary judgment is DENIED with respect to plaintiff's Fair Credit Reporting Act credit defamation claims and GRANTED with respect to plaintiff's claims of invasion of privacy and tortious interference with credit expectancy.