**Penny Lee ANDERSON and Russell D. Anderson, Sr., Plaintiffs,**

v.

**TRANS UNION, LLC; Experian Information Solutions, Inc.; CSC Credit Services, Inc.; and Equifax, Inc., d/b/a Equifax Information Services, LLC; Defendants.**

No. 03–C–0510–C.

United States District Court, W.D. Wisconsin.

Nov. 24, 2004.

Thomas J. Lyons, Jr., St. Paul, MN, for Plaintiffs.

Ian A.J. Pitz, Michael Best & Friedrich, LLP, Kendall W. Harrison, La Follette, Godfrey & Kahn, S.C., Madison, WI, Lewis P. Perling, Kilpatrick Stockton LLP, Atlanta, GA, for Defendants.

## OPINION and ORDER

CRABB, District Judge.

This is a civil action in which plaintiffs Penny Lee Anderson and Russell D. Anderson, Sr., are suing four credit reporting agencies, Trans Union, LLC, Experian Information Solutions, Inc., CSC Credit Services, Inc. and Equifax, Inc., d/b/a Equifax Information Services, LLC, for alleged violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681u. Plaintiffs allege that all four defendants

willfully and negligently violated 15 U.S.C. § 1681i in various ways, such as by failing to investigate plaintiffs' dispute regarding the errors and inaccuracies in their credit reports, re-inserting disputed consumer information after deleting it when defendants knew or should have known the information was false, by failing to so inform plaintiffs, and failing to maintain reasonable procedures designed to prevent the reappearance of previously deleted information in a consumer's file.

Plaintiffs allege also that defendants' actions in reporting plaintiffs as deceased on their credit reports constitute willful, deliberate credit defamation in violation of Wisconsin law and tortious interference with plaintiffs' credit expectancy. Plaintiffs assert jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

Originally, plaintiffs included Cross Country Bank and Applied Card Systems, Inc. as defendants. Plaintiffs have dismissed these defendants from the case and are resolving their dispute with them in arbitration. Three of the remaining defendants have filed their own motions for summary judgment on some of plaintiffs' claims; defendant Equifax did not file its own motion but moved to join the motions filed by CSC and Experian. This was an odd strategic decision. I cannot decide whether Equifax is entitled to summary judgment without knowing whether any of the material facts concerning this defendant are in dispute and I cannot determine what facts are in dispute unless defendant proposes the facts material to its motion. What happened to the three other defendants is useful information but not necessarily determinative of Equifax's fate.

As to the moving defendants, I conclude that CSC Credit Services is entitled to summary judgment on all of plaintiffs' claims. No reasonable jury could conclude that this defendant did not follow reasonable procedures to assure the maximum possible accuracy of the information it reported or that it failed to comply with its obligations to reinvestigate plaintiffs' dispute when plaintiffs gave it proper notice of a dispute. In addition, plaintiffs' state law claim of credit defamation is preempted by federal law and they have abandoned their claim of interference with credit expectancy. Defendant Trans Union is entitled to partial summary judgment on plaintiffs' claims that this defendant prevented them from obtaining refinancing from Ameriquest, credit from Conseco and a mortgage from Centennial Mortgage and on plaintiffs' state law claims. Defendant Experian is entitled to partial summary judgment on plaintiffs' claims that it acted in willful violation of the Fair Credit Reporting Act, that it failed to conduct proper re-investigations of disputes brought to its attention in 2000 and 2001, (because the statute of limitations bars these claims) and that it violated state law by defaming plaintiffs' credit or credit expectancy.

The moving defendants complicated the fact finding process by including inadmissible hearsay and legal issues in their proposals. To their credit, however, they cited record evidence for their proposals, which is something plaintiffs failed to do. Not only did plaintiffs omit the necessary support to put defendants' proposals into dispute, they caused considerable confusion when they electronically filed two different documents under the same heading (Plainitffs' [sic] Proposed Findings of Fact Relevant to Defendants' Motions for Summary Judgment or Partial Summary Judgment"). On reading, one document appears to be plaintiffs' proposed findings, as advertised; the other appears to be a response to defendants' proposals and has now been docketed as a separate document.

In finding that the following facts are material and undisputed, I have ignored proposed findings that rest on inadmissible evidence or are legal in nature and I have ignored plaintiffs' attempt to dispute facts proposed by defendants when the purported disputes are unsupported by any citations to the record.

## UNDISPUTED FACTS

Plaintiffs Penny Lee Anderson and Russell D. Anderson, Sr. are husband and wife. Neither is deceased. Defendants Trans Union, LLC, Experian Information Solutions, Inc. and CSC Credit Services, Inc. are credit reporting agencies. In that capacity, defendants collect credit information furnished them by other sources, generate consumer disclosures and consumer reports that are disseminated to creditors (referred to as "customers" by the agencies) and consumers and maintain the credit files of approximately 190 million consumers, including plaintiffs. Each defendant processes about 2 billion items of information each month and issues approximately 2 million credit reports each day.

*Facts relevant to CSC Credit Services*

Defendant CSC and defendant Equifax Information Services, LLC are separate organizations that share a database. Defendant CSC receives information from various creditors around the country, assembles that information into credit reports and makes the reports available within seconds upon request to subscribers engaged in credit-related transactions. The process is largely electronic: defendant CSC has contracts with creditors, requiring them to report accurately; the creditors provide information through the use of coded tapes transmitted to defendant on a monthly basis. Defendant Equifax processes the information electronically, matching the credit information with a particular consumer's credit file through a complex set of logic programs. Creditors update the credit files electronically to re-

flect new information regarding the reported accounts.

Companies that subscribe to defendant CSC's credit reporting service can obtain credit reports on consumers within seconds, usually through a computer terminal at the subscriber's place of business. Defendant CSC does not originate or create any credit information, make loans or decide who should receive credit.

It is still possible to obtain credit through traditional underwriting, that is, without a credit score. On at least two occasions, plaintiffs obtained credit in this manner.

From time to time, errors show up on credit reports. Ordinarily, when defendant CSC receives notice that a creditor is reporting allegedly incorrect information, it conducts reinvestigations by sending the creditor a Consumer Dispute Verification form or Automated Consumer Dispute Verification form. Through these forms, defendant CSC advises the creditor of the consumer's dispute. It asks the creditor to investigate its information concerning the relationship it has with the consumer, to determine the accuracy and completeness of the information it is reporting and report back to defendant CSC within a short period of time.

If the creditor verifies the information it provided, CSC considers that verification together with any information the consumer supplied and either revises the consumer's report or leaves it unchanged. If the creditor reports that the information is erroneous, defendant CSC either deletes or modifies the information on the credit report, as appropriate. If the creditor does not respond to CSC within the required time, CSC deletes the disputed item from the consumer's credit report as unreliable, wherever that is appropriate. It is defendant CSC's practice to notify the consumer of the outcome of the investiga-

tion and to give the consumer the opportunity to insert into the credit report a statement regarding any disputed information. Defendant may use additional procedures in individual cases depending on the precise dispute involved and the circumstances of the case.

The Consumer Dispute Verification form and the Automated Consumer Dispute Verification form are standard industry forms designed by the Consumer Data Industry Association, an international trade organization. The Universal Data Form and Automated Universal Data form are other standard industry forms on which customers submit interim reports updating credit information between tape submissions. When defendant CSC receives either of these forms, it must manually update the account tradeline on its system to reflect the new information. At that point, it places a "freeze" on the account to prevent the account from being updated by tape automatically for the next 90 days. This freeze enables the submitting creditor to alter its own internal records to reflect the updated information and change the information it submits by tape to CSC during the normal cycle. Once the freeze ends, the account can be updated regularly by the creditor as usual. The updating process enables creditors to make specific changes to their account reports while keeping the accounts reasonably current.

Sometime in 1999, plaintiffs opened a MasterCard account with Cross Country Bank. Cross Country Bank reported this account to defendant CSC under a number assigned to Cross Country as the customer. Sometime thereafter, plaintiffs' address changed, not because they had moved but because their street was renamed. For some reason, an employee at Cross Country set a flag on plaintiffs' account that produced a faulty notation of deceased, although a flag setting is not the bank's standard procedure for reporting that account holders are deceased. The bank did not know that the flag had been set or that it was causing plaintiffs to be reported as deceased. The only way it might have learned that it was reporting plaintiffs as deceased would have been by reviewing its "credit dump reports," where it might have seen that the flag producing the deceased status halfway down the middle column of the report had the notation "CHD deceased flag—B." Without realizing the problem with the flag, Cross Country reported misinformation about plaintiffs' account to credit reporting agencies from 1999 through November 2003. The problem worsened when Cross Country converted plaintiffs' MasterCard account to Visa and reported the Visa account with a different account number for plaintiffs and a different Equifax customer number for itself. For a period of time, both accounts were reported on plaintiffs' credit reports, along with the notation of deceased.

The nature of the flag was such that if the bank tried to change the status of plaintiffs' accounts from deceased to joint or individual and subsequently sent another tape to the credit reporting agencies without removing the flag, the deceased notation would still appear on the tape. Regardless of Cross Country Bank's responses to defendants' inquiries about plaintiffs' accounts or its instructions to update the account status, plaintiffs' account would continue to show deceased so long as the flag was on the bank's monthly tape. When plaintiffs or credit reporting agencies contacted the bank to dispute the deceased notation, the bank's representative would not have been able to see the flag unless he or she examined the credit report dumps. The bank did not discover the flag until after plaintiffs brought this suit and the bank began an extensive internal investigation that revealed the problem. During this time, the bank's internal

view of plaintiffs' accounts was that they were in good standing.

Plaintiffs advised defendant CSC of a dispute over the information on plaintiffs' MasterCard account for the first time in June 2000. In response to this dispute, defendant CSC "suppressed" the account information, which means that defendant deleted the information permanently from a publicly available credit report, while at the same time, tracking the account to make sure that it did not appear on a credit report even though the creditor may continue to provide electronic update information for that account. If defendant were to remove the account from its records entirely, the creditor could "reinsert" the account via regular tape reporting.

Cross Country Bank viewed plaintiffs' Visa account as a continuation of the MasterCard account and imported the erroneous flag into the new account. When the bank reported the information to defendant CSC under a different account number and a different member number, the information eluded defendant's suppression mechanism. Thus, starting in May 2002, plaintiffs' Visa account showed up with a notation of "consumer deceased."

On November 2, 2002, plaintiff Penny Anderson wrote to ask defendant CSC to remove the notation of deceased from plaintiffs' credit reports. She attached to her letter the second page of a credit report and two letters denying credit to plaintiffs but she did not include her full name, address, date of birth, social security number or account number. Without this information, CSC was unable to identify the appropriate consumer account to begin the reinvestigation of a consumer dispute. In this situation, its policy is to send a form letter to the consumer, asking for additional information. If it cannot locate the consumer, it does not open a file or keep a copy of the letter. Defendant CSC has no record of having ever started

an investigation into plaintiff Penny Anderson's credit report. However, it was able to locate a credit file for plaintiff Russell Anderson and begin a reinvestigation of his Cross Country Bank account. As part of that investigation, it sent the bank a form informing it that the consumer was contending he was not deceased and asking the bank for additional information, including complete identification and account information. The bank did not respond to the letter. In conformance with its procedures, defendant CSC deleted the Visa account from plaintiff Russell Anderson's credit report as unverifiable. On December 20, 2002, it wrote him to inform him of the deletion of the Visa account information and enclosed a copy of the credit report showing its deletion.

In January 2003, defendant CSC received a Universal Data Form from Cross Country Bank relating to plaintiff Penny Anderson. In response to that form, defendant manually removed the "deceased" notation from the Visa account tradeline on her credit report and froze the Visa account for 90 days. In May 2003, when the freeze expired, Cross Country's erroneous flag reappeared on the Visa account, updating it automatically to include the deceased notation in defendant CSC's records. Neither plaintiff notified defendant CSC of the updating before filing suit in September 2003. Once the bank had fixed its internal records to delete the obscure flag, defendant CSC was able to remove the objectionable notation from plaintiffs' Cross Country Bank accounts. It has not reappeared on plaintiffs' credit reports since the bank fixed its internal records.

On or about July 2, 2002, plaintiff Penny Anderson's application for a bank card from Bank of America was denied. From August 5, 2002 through August 15, 2002, plaintiffs applied for car loans through Ford Motor Credit at two different loca-

tions and were approved for loans at 8.9% and 1.9%.

On or about August 18, 2002, plaintiff Penny Anderson asked for and received a copy of her CSC credit report containing the notation "deceased" on the Visa account. On or about August 18, 2002, plaintiff Russell Anderson's application for an American Express card was denied on the ground that his score was not available because he had been reported dead. Plaintiff Russell Anderson believes that his application was denied on the basis of his CSC credit report.

On or about October 28, 2002, plaintiff Penny Anderson applied for credit from Conseco. The application was denied on the ground that Conseco was "unable to grant credit under the terms and conditions requested." According to the document, Conseco had six reasons for denial: bad debt on public record, limited credit experience, excessive inquiries of credit bureau, insufficient current rated accounts, amount of indebtedness and "applicant deceased."

On or about January 7, 2003, plaintiff Penny Anderson saw a copy of her credit report, which showed her Visa account accurately without a notation of "deceased."

On or about July 12, 2003, plaintiff Penny Anderson's application for a Fleet Street credit card was denied. The denial letter indicates that defendant CSC is not responsible for the denial.

On or about July 12, 2003, plaintiff Russell Anderson was laid off from work. On or about August 2, 2003, plaintiffs saw a tri-merged credit report attributing an unnumbered tradeline to defendant CSC with a notation of deceased but showing that defendant CSC was not reporting the Visa account on either plaintiff's credit report.

On or about September 11, 2003, plaintiffs' application for a mortgage loan was denied by Ameriquest. Although Ameriquest gave as a reason the notation of deceased in a credit report, it would have denied the application anyway because plaintiffs' income was insufficient and their debt level was too high to obtain refinancing.

On or about July 12, 1999, July 16, 1999, February 17, 2000, April 11, 2000, August 18, 2002 and August 2, 2003, plaintiff Penny Anderson asked for and received consumer disclosures from defendant CSC showing the notation of deceased on her CSC credit report. Plaintiff Russell Anderson asked for and received similar consumer disclosures from CSC on or about August 6, 1999, April 11, 2000 and May 16, 2000.

*Facts relevant to Trans Union*

When plaintiffs applied for a loan of $190,000 from Ameriquest Mortgage, Penny Anderson's annual income was $30,000 and Russell Anderson was unemployed. Plaintiffs' mortgage payments were $1,529 a month, their checking account balance was $1,000 and they did not have a savings account. Their monthly income was $2,500; their monthly obligations were $3,070; and their debt to income ratio was in excess of 100%. In addition, plaintiffs had four accounts placed for collection. At the time of plaintiffs' application, Ameriquest did not extend loans to applicants with debt to income ratios in excess of 100%. However, Ameriquest told plaintiffs that it was denying their application because their credit report showed them as deceased.

Penny Anderson applied for credit from Conseco Bank. Conseco denied the request but did not rely on a Trans Union report when it did so. Plaintiffs were denied credit from Capital One, which wrote them to say that it had denied them credit because the credit report showed them as deceased.

Plaintiffs were denied credit from Fleet Street on the ground that they had insufficient credit history. Plaintiffs were denied credit from Wells Fargo because the credit report showed them as deceased. They were denied credit by Bank of America because of insufficient credit history.

Defendant Trans Union has never misrepresented anything to plaintiffs. Plaintiffs know of no reason why this defendant would set out to cause her harm.

*Facts relevant to Experian*

When Cross Country Bank responded to defendant Experian's Automated Dispute Verification concerning plaintiffs' MasterCard and Visa accounts by indicating that the account information was "Verified as Reported," the bank understood that Experian would make no change to the account information.

Creditors have valid reasons for reporting a consumer as deceased and for doing so on a monthly basis. One reason is to prevent fraud through identity theft.

Defendant Experian does not have access to the records of creditors such as Cross Country Bank. Generally, the bank is a reliable reporter of credit information.

## OPINION

The Fair Credit Reporting Act creates a private right of action against consumer reporting agencies for the negligent or willful violation of any duty imposed under the statute. 15 U.S.C. §§ 1681o (negligent violations) and 1681n (willful violations); *Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7th Cir.1994). A consumer reporting agency that violates the provisions of the Act negligently may be liable to the consumer for actual damages, costs and attorney fees, 15 U.S.C. § 1681o; a willful violation may make the agency liable to the consumer for punitive damages. 15 U.S.C. § 1681n.

■ Under the Act, a consumer reporting agency is required to follow "reasonable procedures to assure maximum possible accuracy" of the information contained in a consumer's credit report. 15 U.S.C. § 1681e(b). It is not " 'strictly liable for all inaccuracies.' " *Henson,* 29 F.3d at 284 (quoting *Cahlin v. General Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991)). Thus, a consumer reporting agency will not be liable under § 1681e(b) if it reported inaccurate information on a consumer's credit report provided it followed "reasonable procedures to assure maximum possible accuracy." *Id.* at 284.

### A. *CSC Credit Services*

Defendant CSC has moved for summary judgment on all of plaintiffs' claims, including those of negligent and willful violation of the Fair Credit Reporting Act in count 1 of the complaint. It maintains that plaintiffs cannot show that it failed to comply with the requirement of § 1681e(b) that it follow "reasonable procedures to assure maximum possible accuracy" of the information it reported or with the requirement in § 1681i that it reinvestigate plaintiffs' dispute. As to counts 2 and 3, it maintains that plaintiffs' allegations of credit defamation under Wisconsin law and interference with plaintiffs' credit expectancy are preempted by federal law.

### 1. *Count one— § 1681e(b)*

■ The first question defendant CSC's argument raises is whether it is plaintiffs' or defendant's burden to show the reasonableness or unreasonableness of defendant's procedures under § 1681e(b). The Court of Appeals for the Third Circuit discussed this question in *Philbin v. Trans Union Corp.,* 101 F.3d 957 (1996), noting that the Court of Appeals for the District of Columbia had held that the burden falls on the plaintiff, *Stewart v. Credit Bureau,*

*Inc.,* 734 F.2d 47 (1984) (per curiam), but that the burden is minimal and plaintiff need not introduce direct evidence of the unreasonableness of the procedures. For example, in *Stewart,* the court held that in some instances, "inaccurate credit reports by themselves can fairly be read as evidencing unreasonable procedures," such as when two different reports on the same consumer are inconsistent or the agency has two similar files on the same consumer. *Id.* at 51–52. The Court of Appeals for the Ninth Circuit has held that a consumer need only produce evidence "tending to show that a credit reporting agency prepared a report containing inaccurate information." *Guimond v. Trans Union Credit Information Co.,* 45 F.3d 1329, 1333 (1995). Once the consumer has done this, the "agency can escape liability if it establishes that an inaccurate report was generated despite the agency's following reasonable procedures." *Id.* In *Philbin* itself, the court of appeals ducked the question of exactly what a consumer would have to show before the burden shifts to the credit reporting agency to show that it employed reasonable procedures. Instead, it held that under any standard, the plaintiff would have met his burden: he had introduced evidence that on two different occasions, defendant Trans Union had produced credit reports showing that he had been released from a tax lien, despite having corrected the credit report earlier to show that the tax lien was against his father and not him. *Philbin,* 101 F.3d at 960–62.

■ This case is different from *Philbin* because CSC has come forward with an explanation of its procedures that shows that those procedures were reasonable. They were inadequate only because they did not anticipate the wholly unusual, inadvertent error that the Cross Country Bank employee introduced into the system. It would be unreasonable to hold that a credit reporting agency must anticipate every possible erroneous data entry that one of its customers might make and develop a responsive procedure. Although an agency must anticipate that its customers will make errors and develop backup or screening systems to weed these out to the extent possible, it cannot expect that a customer will insert a flag that would resist all the usual efforts to delete it from the system and would remain hidden even to the customer reviewing the account at CSC's request. I conclude that no reasonable jury could find that defendant CSC's procedures were unreasonable solely because they failed to catch the hidden flag that was inserted into the system by Cross Country Bank.

In *McKeown v. Sears Roebuck & Co.,* 335 F.Supp.2d 917, 930–31 (W.D.Wis.2004), I held that a reasonable jury might find that the procedures employed by the credit reporting agencies in that case were unreasonable because they did not include any mechanism for noting discrepancies in accounts that showed both a notation of "deceased" in one tradeline and activity in others. On reconsideration, I am persuaded that this holding was incorrect. In *Henson v. CSC Credit Services,* 29 F.3d 280, 285 (7th Cir.1994), the court of appeals held as a matter of law that

> a credit reporting agency is not liable under the [Fair Credit Reporting Act] for reporting inaccurate information obtained from a [presumptively reliable source], absent prior notice from the consumer that the information may be inaccurate. [In the case of inaccurate court records, a] contrary rule of law would require credit reporting agencies to go beyond the face of numerous court records to determine whether they correctly report the outcome of the underlying action. Such a rule would also require credit reporting agencies to engage in background research which

would substantially increase the cost of their services.

Although *Henson* involved information obtained from court records, the holding seems equally applicable to reports from customers, who have both a contractual agreement and built-in incentives to be accurate in their reporting, if only to continue their ongoing relationship with the credit reporting agency. Of more significance, however, is the practical consequence of a requirement that agencies initiate inquiries on their own whenever their computers discern an apparent discrepancy between a notation of deceased and activity in another account. In *Henson,* the court of appeals noted the significant increase in the cost of services that would follow from a holding that agencies had to engage in background research. An obligation to conduct investigations of questionable deceased notations would impose an equally costly burden, particularly given the number of consumers who die each day. It cannot be unusual for deceased consumers to have apparently active accounts, either because transactions are not recorded until after the consumer has died or because a spouse or personal representative is paying off the decedent's debts or incurring new ones on the same account.

Requiring credit reporting agencies merely to confirm a customer's report of death might be fairly inexpensive since those mechanisms are in place already. As this case demonstrates, however, such checking is of value only if the notation is a mistake and the customer is either aware of the mistake or can find it and correct it. Requiring the agencies to notify consumers that one creditor has reported them deceased would be an enormous cost because it could not be done electronically. Moreover, it would only be telling consumers something they would learn eventually anyway whenever they applied for credit. Whatever the value to the consumer of earlier notice is offset by the enormous cost to the credit reporting agency of providing such notice. The structure of the Act indicates that Congress never intended such self-initiation of investigations. Instead, by providing that the complaint would trigger the agency's obligation to investigate and make corrections, Congress placed the obligation on the consumer to identify mistakes and bring them to the attention of the agencies.

I conclude that before plaintiffs initiated a complaint about the Cross Country information, defendant CSC had no obligation to check the accuracy of that information or to take note of the discrepancy between a tradeline showing deceased and other tradelines showing activity. It is undisputed that Cross Country is a reliable source, that is, one "unlikely to lead to inaccurate credit reporting except in isolated instances." *Henson,* 29 F.3d at 285; *McKeown,* 335 F.Supp.2d at 929. No reasonable jury could find that defendant CSC failed to comply with § 1681e(b)'s mandate "to follow reasonable procedures to assure maximum possible accuracy of the information concerning" plaintiffs.

### 2. *Count one—§ 1681i*

 As to defendant CSC's re-investigation obligations under § 1681i, I conclude that no reasonable jury could find that defendant failed to meet its statutory obligations in this respect. It responded to plaintiffs' June 2000 dispute by suppressing the Cross Country Bank Master-Card account (deleting the information permanently from publicly available credit reports and monitoring the account to be sure that it did not reappear on a credit report). It responded to plaintiff Penny Anderson's November 2002 dispute as best it could in light of the lack of information in plaintiff's letter. It checked plaintiff Russell Anderson's Visa account and delet-

ed it from his credit report when Cross Country Bank did not respond in a timely manner. Later, when it received information from Cross Country that plaintiff Penny Anderson was not deceased, it removed the notation from the Visa account tradeline manually and froze the account for 90 days. It was not unreasonable for defendant CSC to assume that Cross Country Bank would not resume its electronic reporting of the deceased notation at the end of the 90–day period once the bank had confirmed that the notation was an error.

Plaintiffs have not identified any deficiencies in CSC's handling of the investigations. No reasonable jury could find that defendant's procedures were not reasonable under ordinary circumstances to prevent the reappearance in plaintiffs' files and credit reports of the notation that they were deceased. § 1681i(a)(5)(C) (agency is to maintain reasonable procedures designed to prevent reappearance of information deleted pursuant to subsection (5) of § 1681i(a)).

### 3. *Punitive damages*

It follows from the finding that defendant CSC did not violate §§ 1681e(b) and 1681i that it cannot be liable for punitive damages arising out of its willful violation of these statutes.

### 4. *Count two—credit defamation*

■ Defendant CSC contends that plaintiffs' claims of credit defamation under state law are preempted by the Fair Credit Reporting Act's prohibition of consumer actions or proceedings against credit reporting agencies in the nature of defamation "based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part of the report except as to false information furnished with malice or willful intent to injure such consumer." § 1681h(e). If defendant is correct, plaintiffs would be un-

able to proceed on their claims that the denials of their applications for credit from Bank of America, American Express and Conseco constituted credit defamation for which defendant CSC was responsible.

■ In determining what Congress intended as to preemption, courts look at the statutory language, structure and purpose, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)), and in the absence of "an express congressional command," whether the state law is in actual conflict with federal law or whether federal law so thoroughly occupies a legislative field as to imply that Congress left no room for the states. Plaintiffs argue that there is no conflict between the Act and state law because the Act does not place obligations on furnishers of information that conflict with their obligations under state common law. Rather, the state common law "simply provides an additional recourse for the same unlawful conduct." Plts.' Br., dkt. # 66, at 10.

Contrary to plaintiffs' argument, the courts that have addressed the question of preemption have read § 1681h(e) as preempting state actions against credit furnishers unless, as the statute provides, the plaintiffs have alleged acts that amount to willfulness. The courts have understood the intent of the provision to be to protect credit furnishers that try to comply with the Fair Credit Reporting Act. *E.g.*, *Thornton v. Equifax, Inc.*, 619 F.2d 700, 703 (8th Cir.1980) ("qualified immunity provided for by the [Fair Credit Reporting Act] is meant by Congress to be the 'quid pro quo for full disclosure'") (quoting *Retail Credit Co. v. Dade County*, 393 F.Supp. 577, 584 (S.D.Fla.1975)). Although these decisions are not binding on this court, they are persuasive. It would

conflict with the congressional intent to provide a "quid pro quo" to allow consumers "additional recourse" under state law for the same acts that Congress has immunized in § 1681h(e).

Plaintiffs argue that their claims are not preempted because they are not based on a disclosure made pursuant to § 1681h or "by a user of a consumer report to or for a consumer against whom the user has taken adverse action based in whole or in part on the report." I addressed this same argument in an opinion and order entered in *McKeown*, 335 F.Supp.2d at 942–43. The argument is that § 1681h bars suits based on defamation claims only when the claims arise out of *required* disclosures to the consumer, not when they are based on disclosures to third parties; §§ 1681g and 1681h require credit reporting agencies to disclose credit information to *consumers* upon consumers' request, whereas § 1681m requires users of consumer reports to disclose information to consumers against whom they have taken adverse actions; thus, § 1681h(e) bars only those defamation claims that arise out of disclosures to plaintiffs and does not bar defamation claims based on disclosures to third parties.

In *McKeown*, I rejected this argument because it was based upon a reading of § 1681h(e) that would render the provision meaningless. "[A]ll defamation claims arise out of disclosures to third parties; it is a prima facie element of the claim." *McKeown*, 335 F.Supp.2d at 942. Moreover, the language of § 1681h(e) bars claims based on "*information* disclosed pursuant to section 1681g, 1681h, or 1681m" and not claims based on the disclosure itself.

Plaintiffs can pursue a claim for credit defamation only if they can establish that the information at issue was "furnished with malice or willful intent to injure such consumer." § 1681h(e). They argue that

"a reasonable jury could easily conclude that Defendants' conduct exhibited a reckless disregard for the truth and for Plaintiff's [sic] rights." Plts.' Br., dkt. # 66, at 14. As I noted in *McKeown*, 335 F.Supp.2d at 943, § 1681h(e) establishes a higher burden than reckless disregard for the truth: it requires a showing of malice or willful intent to injure. Plaintiffs have not cited any evidence that would support such a showing.

5. *Count two—interference with credit expectancy*

Plaintiffs seem to be bringing their "tortious interference with credit (economic) expectancy" as a cause of action known in Wisconsin as "interference with prospective economic relations." Defendant CSC contends that plaintiffs have no evidence that defendant ever acted with the purpose of interfering with an prospective contract. Plaintiffs have not responded to defendant's arguments. I interpret this lack of response as a decision to abandon the claim. *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir.1999) (arguments not developed are deemed waived).

B. *Trans Union's Motion for Partial Summary Judgment*

Trans Union is moving for summary judgment in its favor on parts of count I and all of counts II and III. I have found already that plaintiffs have no viable claim against defendant CSC under Wisconsin law for credit defamation or interference with plaintiffs' credit expectancy. The same reasoning applies to plaintiffs' state law claims against defendants Trans Union and Experian.

1. *Violations of 15 U.S.C. § 1681i*

■ In moving for partial summary judgment on count 1, defendant Trans Un-

ion moves for judgment only with respect to plaintiffs' allegations that the inaccurate information on their credit report prevented them from obtaining refinancing from Ameriquest, credit from Conseco and a mortgage from Centennial Mortgage. Plaintiffs do not deny that Centennial's mortgage denial is outside the statute of limitations. Therefore, the only question is whether an inaccurate entry by Trans Union was the cause of the denial of the Ameriquest refinancing or the Conseco denial of credit. *Crabill v. Trans Union L.L.C.*, 259 F.3d 662, 664 (7th Cir.2001) (to obtain award of "actual damages," plaintiff must show "causal relation between the violation of the statute and the loss of credit, or some other harm").

In the case of Ameriquest, plaintiffs have not shown that they would have received approval of their request for refinancing even if the Trans Union report had been absolutely accurate. To the contrary, the undisputed facts show that they would not have qualified for refinancing because of their lack of income and hefty debts. Thus, they cannot show the prerequisite causal relation between the violation of the statute and the loss of credit; the deceased notation was not "a substantial factor in bringing about" the denial of credit. *Restatement (Second) of Torts* § 431(a). This is not a situation in which the denial of credit could be said to be "based upon a mixture of legitimate and illegitimate considerations," *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or one in which a number of different factors entered into the denial of credit, so that any one factor is insufficient but the total is causal and each may then be considered a substantial factor in causing a plaintiff's injury, *Philbin*, 101 F.3d at 969 (citing Keeton *et al.*, *Prosser & Keeton on Torts* § 41, at 266–67 & n. 25 (5th ed.1984)).

As to the Conseco denial of credit, plaintiffs have no semblance of a claim against this defendant. It is undisputed that Conseco did not rely on any act or statement of Trans Union when it denied plaintiff Penny Anderson's application for credit.

### C. *Experian's Motion for Summary Judgment*

Defendant Experian contends that (1) plaintiffs cannot establish that it acted in willful violation of the Fair Credit Reporting Act so as to. be entitled to punitive damages; (2) plaintiffs' claims related to four re-investigations in 2000 and 2001 are barred by the statute of limitations set out in the Act; and (3) plaintiffs' state law claims for credit defamation and tortious interference with credit expectancy are preempted by the Act. Plaintiffs oppose the motion on the grounds that a jury could find that defendant's conduct was willful and that the credit defamation claim is not preempted. They say nothing about the tortious interference claim or the statute of limitations. As I noted above, failure to develop an argument constitutes waiver. As I have also noted, plaintiffs cannot prevail on their non-preemption defense. This leaves only the question of willfulness.

Under § 1681n of the Fair Credit Reporting Act, a plaintiff can collect punitive damages if he can show a willful failure to comply with any requirement imposed under the Act with respect to any consumer. "Willful" denotes knowledge and intention. One court has interpreted the term to mean a knowing and intentional act committed in conscious disregard for the rights of others. *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir.1986). In the *McKeown* case, I held that to be willful, " 'a defendant's actions must be on the same order as willful concealment or misrepresentations.' " *McKeown*, 335 F.Supp.2d at 940 (quoting *Cushman v.*

*Trans Union Corp.*, 115 F.3d 220, 226–27 (3d Cir.1997)).

Plaintiffs have not identified any act by defendant Experian that could be characterized as comparable to willful concealment or misrepresentation. Their only assertion to this effect is that the credit reporting agencies "blithely and recklessly reported 'deceased' whenever the monthly reporting came in from [Cross Country Bank], despite the fact that [the bank] and Plaintiffs had *both* repeatedly told the [credit reporting agencies] that the deceased was wrong [sic—probably should be "the deceased notation"]." Plts.' Br., dkt. # 66, at 9.

■ Plaintiffs have no evidence that defendant Experian acted with the kind of wilfulness required under § 1681n. They do not deny that each time they notified defendant of the problem, defendant sent them a response in the form of a consumer disclosure or a correction summary. In itself, the mere reappearance of inaccurate information that had been deleted previously is insufficient to show the kind of conscious disregard or deliberate and purposeful action necessary to make out a claim of willfulness. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 970 (3d Cir.1996); *Casella v. Equifax Credit Information Services*, 56 F.3d 469, 476 (2d Cir.1995); *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir.1991) (Act requires only that credit reporting agency maintain reasonable procedures). The undisputed facts are that the notation of deceased originated with Cross Country Bank, that defendant Experian made at least one effort to check the accuracy of this information and was told by the bank that the information was accurate, that defendant advised plaintiffs that they should work with the bank to correct the notation, that the bank's report to Experian continued to show the deceased notation so long as the flag remained on the

bank's monthly tape but the bank would have been unaware of it, and that as soon as the bank did discover the problem, defendant Experian was able to remove the notation from plaintiffs' Visa and Master-Card accounts. It was not a conscious disregard for plaintiffs' rights for defendant to rely on its customer for information about plaintiffs. Not only is such reliance the custom in the industry but it is undisputed that Cross Country Bank was a reliable source of credit information.

To hold that defendant Experian acted in conscious disregard for the rights of consumers simply because it unknowingly reported inaccurate information conveyed to it by a reliable source of credit information would transform the Fair Credit Reporting Act into a strict liability statute. Congress did not intend strict liability; its intent was to require credit reporting agencies to maintain reasonable procedures.

### ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendant CSC Credit Services, LLC is GRANTED with respect to all of plaintiffs Penny Lee Anderson's and Russell D. Anderson, Sr.'s claims against this defendant.

2. The motion for partial summary judgment filed by defendant Trans Union, LLC is GRANTED with respect to plaintiffs Penny Lee Anderson's and Russell D. Anderson, Sr.'s allegations in count 1 that this defendant was responsible for plaintiffs' inability to secure a loan from Ameriquest Mortgage, credit from Conseco Bank or a mortgage from Centennial Mortgage and with respect to all of counts 2 and 3.

3. The motion for partial summary judgment filed by defendant Experian Information Solutions, Inc. is GRANTED

with respect to plaintiffs Penny Lee Anderson's and Russell D. Anderson, Sr.'s contentions in count 1 that this defendant acted in willful violation of the Fair Credit Reporting Act, with respect to plaintiffs' allegations that defendant violated the Act in the manner in which it conducted four re-investigations in 2000 and 2001 and with respect to all of counts 2 and 3.

4. To the extent that defendant Equifax, Inc. attempted to move for summary judgment, its motion is DENIED.